MASSACHUSETTS BONDING AND INVESTMENT COMPANY, APPELLANT, v. SIMONDS-SHIELDS-LONSDALE GRAIN COMPANY, RESPONDENT.—49 S. W. (2d) 645.

Kansas City Court of Appeals. April 4, 1932.

*Harding, Murphy & Tucker* for appellant.

*Morrison, Nugent, Wylder & Berger* for respondent.

TRIMBLE, P. J.—Plaintiff, a Massachusetts corporation, authorized in Missouri to execute bonds as a surety for hire, brought this action in May, 1928, seeking to be discharged from liability arising thereafter as surety for defendant on a bond of $25,000 executed by defendant to the State of Missouri as a public warehouseman. The trial court rendered judgment for defendant, whereupon plaintiff appealed.

Defendant was and is the lessee and operator of a warehouse and grain elevator in Kansas City, known as the "Milwaukee Elevator" which it conducts as a public warehouse and elevator for the storage of grain. As such, and in accordance with the provision of what was originally Article 3, Chapter 117, Revised Statutes 1899, entitled "Inspection of Grain" and especially section 7627 thereof (which Article afterward became Article 2, Chapter 60, Revised Statutes 1909, and which section, as amended in Laws 1907, page 285, became section 6777 of said revision, and which Article later became Article 2 of Chapter 49, Revised Statutes 1919, and which last-mentioned section, changed by Laws 1913, page 358, became section 6001 of said last named revision, and said Article now is Article 1 of Chapter 98, Revised Statutes 1929, and said last named section is now section

13329 of said revision), it furnished "Public Warehouseman's Bonds" executed to the State of Missouri, conditioned for the faithful performance of its duties as a public warehouseman, as security for any penalties found by due course of law for violation of any clause of the article and its unreserved compliance with the laws of the State in relation thereto, all in the total penal sum made applicable by the statutory section mentioned.

One of these bonds in the sum of $25,000 was executed by defendant as principal and appellant as surety on the 10th day of January, 1918, which was approved by the circuit court on February 2, 1918, and said bond was duly filed in accordance with the law.

At the time this bond was executed and filed, the rate of the annual premium was one-fourth of one per cent; and on $25,000 this rate would make the annual premium $62.50 and this was the annual premium paid. Sometime after 1919, but prior to 1926, the Towner Rating Bureau (which was a privately owned organization, the principal owner of which, Mr. Towner, was statistician for all surety companies and kept files of their experience and business which, after being "all posted together," average rates for the use of all companies based upon the average experience of all, were arrived at, decided upon and promulgated to all) fixed or announced a rate of one per cent. But at the beginning of 1926 the premium rate was fixed for all companies at $25 per 100,000 bushel capacity of elevator and, as defendant's elevator capacity was now 2,900,000 bushels, this made, at the last above named rate, the annual premium $181.25 instead of $62.50.

There is no contention over the correctness of this larger premium on all bonds written during and after 1926, but the contention is over the right of plaintiff to demand such increased rate when the contract between the parties was the rate at $62.50 per year, and also over whether plaintiff could rightfully seek to be released from furnishing further suretyship in the future at the old rate or, under the terms of the contract, can obtain release without cause.

The annual premium paying date was February 2, of each year, and shortly before this date in 1928, namely on January 10, 1928, Walsh, plaintiff's Resident Manager at Kansas City wrote to McCluer-Wilbur Underwriting Company (a firm of insurance brokers in Kansas City), saying—

"The present term of the above captioned bond will expire on the 2d day of February, 1928.

"Unless we hear from you with advices to the contrary submitting cancellation evidence, we will charge your account with the renewal premium of $62.50 to cover for the year beginning on the above date.

"We trust you will find this satisfactory."

The record does not disclose any written reply to this letter. But a notation appears on the margin thereof as follows: "1/25/28 noti-

fied Walsh (plaintiff's resident manager) to charge renewal." This alone and of itself is hearsay as to its truth; but Mr. Wilbur, witness for defendant, testified that he made the notation and that he did notify Walsh to charge such renewal; but he does not state how or in what words he so notified him, but merely that he "notified him." The evidence in the record, however, is that somewhere about January 25, or 28, 1928, Wilbur of the McCluer-Wilbur Underwriting Company, called plaintiff's resident manager Walsh over the 'phone and said that he (Wilbur) had an order from defendant to renew the bond, but the resident manager told him the rate was, or would be, one per cent instead of one-fourth of one per cent, to which Wilbur replied that such rate of one per cent did not apply. Whereupon the matter remained thus in dispute and unsettled until plaintiff's resident manager had opportunity to consult plaintiff from whom it was learned that the rate was not one per cent but was $25 on each 100,000 bushel capacity (which, as stated, would make the premium $181.25) and this was contended for in two telephone conversations had thereafter. In the meantime on February 2, 1928, according to Wilbur's testimony, the McCluer-Wilbur Underwriting Company made or rendered a bill to defendant for $62.50, the asserted premium due for the year beginning February 2, 1928, which defendant paid to McCluer-Wilbur Underwriting Company on February 3, 1928, but which plaintiff refused to accept, and said McCluer-Wilbur Underwriting Company still holds and retains but were willing at all times to pay to plaintiff but the latter would not accept. The record also shows that in a letter dated January 10, 1927, (possibly a misdate for 1928), the defendant wrote McCluer-Wilbur Underwriting Company that—

"In reply to your two favors of the 4th in reference to . . . $25,000 bond to the State of Missouri, covering the Milwaukee Elevator, we wish to continue these bonds for another year."

With matters in this shape, the plaintiff's resident manager, Walsh, wrote McCluer-Wilbur Underwriting Company on February 17, 1928, stating, in reference to the bond involved herein, that—

"This is to advise you we are charging your account with the renewal premium of .$181.25 due February 2, 1928 under this bond.

"The delay in charging up this premium which is in a different amount to the rate charged heretofore was brought about on account of the negotiations concerning the proper rate. It finally has been definitely ruled by the Rating Bureau that the rate given in Bulletin 3740, September 3, 1926, must govern, which provides that the premium charge be made of $25 for each 100,000 bushels storage capacity of the elevator bonded. This particular elevator has a capacity of 2,900,000 bushels, so that the premium on a $100,000 bond would be $725.00 per annum, and not 1% on the bond penalty nor one-fourth of 1%.

"Under the above circumstances, you will note the correct premium for our bond of $25,000 is $181.25. If there is any question, please advise us at once.

"For your convenience in the event you do not have before you Bulletin 3740 which governs this rate, it reads as follows:

" 'Where Grain Elevators are Bonded BOTH to the State of Missouri and to the Kansas City Board of Trade:

" 'Charge for the Missouri Statutory Bond to the State, annual premium of $25 for each 100,000 bushels capacity of the bonded elevator.' "

To which McCluer-Wilbur Underwriting Company replied on February 18, 1928, saying that—

"We have your letter of the 17th and we are submitting a copy of your letter *to our client*. There is no question about the proper rate on this bond at this time. It should be $181.25 as stated in your letter; that is, however, for a bond applied for and executed at this date. We call the attention of your Company to the fact, however, that it contracted with Simonds-Shields-Lonsdale Grain Company to take this bond, which is continuous in form, at an initial premium of $62.50 and an annual premium thereafter of $62.50, payable on each anniversary date. This is the amount of premium stated in the application and no amendment or agreement has even been made by client to pay any different premium. The bond is not even subject to renewal certificate; it is continuous, and therefore the original agreement as to amount of the charge is still in effect and your Company could not legally collect any more premium than originally agreed upon.

"Your Company could of course institute proceedings in the circuit court to cancel the bond, provided our client did not agree to pay a higher rate. Are we to take it that this is the position your company takes? If your Company does not take that position, it is entirely justified in telling the Bureau that it has a contract at an agreed rate of premium which has been in effect over a period of years and that it intends to live up to its contract. I might say to you that I know of companies which have taken that position and stood by it. My opinion is entirely justified by the action of your Company during all the time this bond has been in effect. The rate on the bond was correct when it was written, but subsequently and during most of the time it has been in effect, in fact until September, 1926, the rate on this kind of a bond was 1% and your Company did not see fit to raise any question until this year." (Italics ours.)

And on April 28, 1928, McCluer-Wilbur Underwriting Company wrote plaintiff that—

"We wrote *our client* on the 25th in regard to the payment of additional premium on this bond and have their reply as per copy enclosed.

"Personally I think your Company, to be consistent, ought to continue on this bond at the rate at which it was originally written, because you did continue on the bond for a great many years after the rate was raised, from 25c per hundred to $1 per hundred, and, as previously stated, your Company has a perfect right to live up to its original agreement to write this bond at twenty-five cents per hundred per annum just as long as it wants to stay on the bond." (Italics ours.)

Thereupon, on May 15, 1928, plaintiff wrote McCluer-Wilbur Underwriting Company as follows:

"Gentlemen:

"Re: F-70872 Simonds-Shields-Lonsdale Grain Company

"We have your letter of May 5th concerning the premium charge on the above captioned bond, and this is to advise that this bond has been in effect since February 2, 1928, and we must at this time request payment of the account in the amount of $181.25. We cannot consider the lower premium charge, and unless a remittance is received promptly or advises from you that it will be remitted promptly, we will be obliged to take steps to terminate our liability.

"Kindly acknowledge receipt and oblige."

As defendant still refused to pay, plaintiff served the notice required by section 12701, Revised Statutes 1929, and brought this action to cancel said bond.

The application for the bond in question was made by defendant upon a form prepared and had by plaintiff, and was dated February 14, 1918, but specified that the date from which the bond was to be written should be from January 10, 1918, and was to be for an "Indefinite" term, and the bond desired was described as "Warehouse bond to State of Missouri," "Amount of bond $25,000," "Premium $62.50."

The application then recited that—

"In consideration of the execution of said bond by the Massachusetts Bonding and Insurance Company (hereinafter called the Company), the undersigned (hereinafter called the Indemnitors) hereby covenant and agree with the Company, its successors and assigns;

"First: That the Indemnitors will pay to the Company $62.50 premium upon execution of the bond and $62.50 on the 10th day of January in each year thereafter until the Company shall have been fully discharged and released from any and all liability upon said bond and all matters arising therefrom, and until there shall have been furnished to the Company, at its principal office in the City of Boston, due and satisfactory proof, by evidence legally competent, of such discharge and release."

. . . . . . .

"Fourth: The Company may decline to become surety for the applicant; and in case it does act as surety it *shall have the right to withdraw or cancel same whenever it shall see fit;* and in any event *the Company shall not be required to disclose the reasons upon which its action was based,* and shall not be responsible for any loss of damage that the applicant may sustain by reason of such action." (Italics ours.)

The condition of the bond, issued in response to said application, is as follows:

Upon the following conditions, however, that whereas Simonds-Shields-Lonsdale Grain Company have applied to the circuit court of Jackson county, Missouri, at Kansas City, for a license and authority to carry on and conduct the business of a public warehouse for the storage of grain with a capacity not exceeding . . . bushels, under the name of Milwaukee Elevator, to be located at Kansas City, Jackson county, Missouri.

"Now, therefore, if the said Simonds-Shields-Lonsdale Grain Company shall faithfully *perform its duties as Public* Warehousemen and shall pay any penalties found and adjudged by due course of law for the violation of any clause of article 3, of chapter 117, of the Revised Statutes of Missouri 1899, and if it shall make full and unreserved compliance with the laws of the State of Missouri in relation thereto, then this obligation to be void, otherwise to remain in full force and effect."

It is perhaps well to remember that even in *private* bonds, continuous in their terms, as distinguished from bonds running to the public, and that, too, in the absence of an agreement to that effect, the surety has a common law right to terminate its liability on notice, remaining liable, however, for any rights the creditor or obligee previously may have acquired. [32 Cyc., sec. 6, p. 85.] This is the case where the consideration for the contract of a surety is *executory*—if his liability is to arise by *future* acts of the obligee and no time has been prescribed in the contract, the surety can terminate his liability by notifying the obligee that he withdraws, remaining liable, however, for any previously acquired rights as above stated. Of course, if the consideration for the surety's contract is *entire* and has been executed fully, as in the case of a bond for the payment of a sum certain or the performance of services, the surety is bound indefinitely (at least so long as the Statute of Limitations permits after the breaking of the condition of said bond), and he cannot terminate his liability by notice. [32 Cyc., sec. 6, p. 86.] To the same effect, see 1 Brandt on Suretyship and Guaranty (3 Ed.), sec. 184; Gumbel Bros. v. Mitchell, 219 S. W. 676, 679; Brewer v. Ruftner, 202 N. W. 206, 207. Likewise, a contract for

hire for an indefinite period and which is executory can be terminated at will by either party. [Latshaw v. Stoddard, 194 S. W. 727, 728.] See also Davis v. Pioneer Life Ins. Co., 181 Mo. App. 353, 356, where it is held that "an indefinite hiring is a hiring at will and may be terminated by either party any time and if terminated by the employer no action will lie as for a wrongful discharge of the employee." A contract will be construed to impose an obligation in perpetuity "only when the language of the agreement *compels* that construction." [McCollum Printing Co. v. Graphite Compendens Co., 150 Mo. App. 383, 391-2.] The general rule is that an agreement, which neither expressly nor by implication has any time fixed for it to expire, is terminable at the will of either party. [Storoske v. Pulitzer Publishing Co., 235 Mo. 67, 77; Bailey v. Stafford, 166 N. Y. Supp. 79, 82; 13 C. J. 604.]

The case of Wiggins Ferry Co. v. Chicago, etc., R. Co., 73 Mo. 389, is not deemed to be contrary to the rule here stated, because in the agreement between the Ferry Company and the Railroad Company, the former had given a consideration, entire and fully executed, namely, a depot site and right-of-way; besides, the contract manifestly dealt with a situation intended to be "permanent," i. e., to continue always. So, too, the case of Harrington v. Kansas City Cable Ry. Co., 60 Mo. App. 223, cited by defendant, does not support its contention but rather that of plaintiff's. For, at page 228, the court in that case say, "It may be freely conceded that a hiring for an indefinite time is a contract determinable at the will of either party," but went on to hold that the contract involved was not of that character, since the consideration was not only the services well performed during the course of plaintiff's service, but a further consideration relating to the length of the service, the releasing of a valuable cause of action the plaintiff had against the defendant in that case, and this part of the consideration emanating from the plaintiff was in the nature of an *executed* consideration.

However, aside from the common law right of a surety to terminate his contract, as to *future* matters, thus not endangering the rights of others either *inchoate*, so to speak, or which have already accrued, the right to so terminate the contract may be rendered doubly secure when such right is expressly reserved in the contract. [32 Cyc. 86.] And this, we think, was done in this case. In paragraph 4 of defendant's application for the bond, defendant agreed that plaintiff might withdraw at will, said agreement being expressed in these words—

"The Company (plaintiff) may decline to become surety for the applicant; and in case it does act as surety it shall have the right to withdraw or cancel same whenever it shall see fit; and in any event

the Company shall not be required to disclose the reasons upon which its action was based," etc.

Of course, this right would be subject to the rights of the people. But the record shows that no such rights are involved or affected in the least, but that on the contrary, owing to the high standing and responsibility of defendant, it can easily procure a new bond elsewhere.

But it is urged in defendant's behalf that the application, in one of its covenants, fixes the annual premium at $62.50 "in language as terse, definite and explicit as it is possible to use," while in paragraph 4 it allows the plaintiff to terminate the relation of surety at will; and that hence there is an inconsistency or ambiguity therein which is open to construction, and, as the application is one prepared by plaintiff and couched in the phraseology desired by it, the meaning of the application will be construed in favor of defendant rather than in favor of plaintiff. But the contention that plaintiff has no right, at any time, *ever* to seek to terminate the relationship, means that plaintiff in fixing premium rate at $62.50, to be paid in each year thereafter, agreed that such rate should likewise remain forever unchanged. But, by the express terms of the clause in relation to the premium of $62.50, such amount is to be paid on the premium paying date "in each year thereafter *until* the Company (plaintiff) shall have been *fully discharged and released* from any and all liability on said bond and all matters arising therefrom," etc. (Italics ours.) In other words, the payment of the $62.50 is to continue *only* while the relationship *lasts* and this clause is dealing with one thing, while the clause giving the plaintiff the right to terminate the bond is dealing with an entirely different thing, and consequently there is no necessity or room for construction since there is no ambiguity. In this connection it may perhaps be claimed that the above covenant fixing the premium at $62.50 forbids the raising of the premium to any higher sum. It does, so long as the parties *both consent* or *allow* the relationship between them to continue to thus exist. But since the plaintiff has reserved the right to withdraw or cancel the bond *whenever it shall see fit,* and that too either *with or without* reason, it would seem that this is broad enough to include a situation where, because of conditions arising with the advancing years, the plaintiff is no longer satisfied to continue the bond at the old premium rate. It does not seem to be reasonable, in view of the stipulated terms between the contracting parties, plaintiff and defendant, that the contract meant that the plaintiff agreed to remain surety throughout succeeding years regardless of the cost of furnishing such service. It is so well known that the cost of nearly everything (except, possibly, *epsom salts* and K. C. Baking Powder, which last has re-

mained twenty-five cents a can for the past twenty-five years), has so greatly increased in the years since 1918, that judicial knowledge could *almost* be taken that no fixed and unalterable contract for the cost of a service or commodity throughout an indefinite period could be safely entered into, or indeed would be, unless expressed in the clearest and most unmistakable terms.

The contention with reference to ambiguity just heretofore considered, proceeds upon the theory that the application and bond consititute the contract between the parties, and we think they do so far as the rights of the parties with regard to *each other* are concerned. With reference to the rights of others by reason of the bond, of course, the bond alone is all that controls, and nothing in the application can be regarded as of any consequence whatever in that regard. But, in the case at bar, it is only the rights of the parties with regard to each other that are solely involved.

But notwithstanding the immediate foregoing contention just disposed of, it is further urged that the application and bond are two separate and independent matters, or, to state it more strictly in accordance with defendant's claim now urged, the claim is that the contract between plaintiff and defendant (i. e., the application) "is in its legal effect totally separate from and independent of the bond itself." As intimated before, it *is,* in any proceeding wherein the rights of those for whose benefit the bond is given are concerned. But where the question is solely what are the rights of the plaintiff and defendant with regard to the relation of principal and surety existing between them by reason of the bond, and the *continuance* of that relation, the application is the *controlling* portion of the contract, subject, however, as heretofore stated, to the rights of the public. That, in a controversy solely between principal and surety, the application is the *controlling* feature of the contract, manifestly appears when it is seen that a clause giving plaintiff the right, within limits careful of the public interests, to withdraw from the bond "whenever it shall see fit," is, in the very nature of things, an important element of the contract and a weighty inducement leading it (the surety) to agree to enter into the obligations of the bond, and that, without it, plaintiff might reasonably, and doubtless would, refuse to enter into the bond and thereby become a perpetual surety regardless of the changed conditions which the distant future might and very likely would bring forth, such as the increased cost of furnishing such suretyship, the increased capacity of defendant's elevator (and thereby the increased value of bonded security) or of any other of the innumerable changes to which the infinite variety of human circumstances may subject the parties to the bond as principal and surety. It would seem that no company would be willing to enter into bond without such reserved right to cancel, and hence,

the rule that no such right exists would have a tendency to greatly increase the difficulty of giving such a bond, or defeat its giving entirely. As we view this contract, plaintiff had a right, within the accrued rights of the public if any did accrue or were likely to be affected, to terminate the suretyship for *any* reason, or for no reason except its desire, or rather election, to cancel or terminate the relation. The rights of the members of the public are in no wise interfered with, nor is there any possibility of their being affected since there is no showing of that kind but to the contrary, and if there should be, the order of the court in discharging the surety could save and reserve such rights, if any, arising during the existence of the present bond, or later growing out of it while it did exist.

It is said the bond here in question is not of a character rendering it susceptible of cancellation by the surety in the absence of a proper reason therefor, since the bond forms a contract which is for the security of the people of the State.

As stated heretofore, there is no showing whatever that their rights have been, or will be, affected by the release and discharge of the surety. Indeed the inferences are all the other way and the judgment is not based on that ground but apparently on the claimed lack of plaintiff's right to terminate the relationship between it and defendant as principal and surety. It is difficult to perceive any good ground for the contention that the bond is not of a character or kind coming within the statutory provisions relating to ''Sureties and Their Discharge.'' In the Revised Statutes of Missouri, 1889, the character of bonds covered by such subject was contained in section 8353 of chapter 158 and was confined to ''any person bound as surety in any bond given by any *officer* to secure the faithful performance of the duties of such officer'' (and provided that such officer may on his petition . . . be discharged from all future liability on such official bond). On March 11, 1891, this section was amended (Laws 1891, p. 217) by inserting after the word ''officer'' and before the word ''to'' in the second line of said section, the words ''including executors, administrators, guardians, curators, assignees, receivers, trustees *and depositaries,''* which clearly extended the statute to bonds of the character indicated and contained in the amendment, and thereafter the statute has existed in that form down through the revisions of 1899 (sec. 4510, chap. 58), of 1909 (sec. 11281, chap. 114), of 1919 (sec. 12699, chap. 116), and of 1929 (sec. 2943, chap. 16), where the last named persons are termed ''depositories instead of ''depositaries.'' Now, a warehouse or a grain elevator is certainly a ''depository,'' for the storing or depositing of grain therein is the service to be performed for the public by them. In 27. R. C. L., sec. 13, p. 958, it is said ''In accordance with the fundamental principle that persons or corporations engaged in

occupations in which the public have an interest or use may be regulated by statute, it has been held in a number of cases that the modern grain elevator located in a commercial center is a matter of public interest which can be regulated by virtue of the general police power." And Division VI of the chapter on "Warehouses," including grain elevators, in 27 R. C. L., secs. 35-36, pp. 977-980, shows beyond all question that their functions as depositories form the larger and most important part of their duties. So that they are now, by virtue of section 12699, chapter 116, Revised Statutes 1919 (and continued in section 2943, R. S. 1929), in the same category as "officers" along with "executors, administrators, guardians, curators, assignees, receivers, trustees," under the term "depositories." And the sureties on the bonds thereof have the same right to proceed to obtain release and discharge as are given by sections 12700-12707, Revised Statutes 1919, now sections 2943-2951, Revised Statutes 1929. The same objections raised against allowing a surety on the bond of a public warehouseman or public elevatorman would apply equally well to any of the othere public officials mentioned in the statute, such as executors, administrators, assignees, etc., but the statute nevertheless permits their release and discharge. In providing this statutory method of obtaining a release, the Legislature did not take away a surety's common law right to be discharged, but merely provided a means of enforcing it as to such public functionaries and, at the same time, of protecting the rights of the public by throwing about the statutory process of obtaining discharge and release the safeguards mentioned in the a foresaid section of the statute. For example, the discharge of a surety must be founded on notice to the obligee, but as this cannot be ascertained in the case of a bond running to the public for an indefinite period in the future, the section 12699 above referred to, provides that—

"Any person bound as surety in any bond given by an officer, *including.* . . . *depositories,* to secure the faithful performance of the duties of such officer, may, on his petition, in writing, addressed to the court authorized by law for the time being to take and approve such official bond, *be discharged* from all *future* liability on such official bond." (Italics ours.)

The warehouseman or elevatorman was required by section 6000, Revised Statutes 1919, to procure a license from the circuit court, and by section 6001 he was required to give the bond and file it with the clerk of that court. An section 12699 (sec. 2943, R. S. 1929) provides for the bringing of the proceeding to obtain release as surety thereon, and sections 12703-12707, Revised Statutes 1919 (secs. 2947-2951, R. S. 1929), specify what shall be done. Section 5999, Revised Statutes 1919 (sec. 13327, R. S. 1929) provides that the owners of a warehouse or elevator, such as that involved herein,

are *"public warehousemen within the meaning of this section."* Section 6003, Revised Statutes 1919 (sec. 13331, R. S. 1929) requires the warehouseman to receive and store the grain offered for storage and "not discriminate" between customers but to make *uniform charges* for service. Sections 6041, 6042, Revised Statutes 1919 (secs. 16369, 16370, R. S. 1929) requires the warehouse, to submit to inspectors and the owners to open their books for inspection. So that it would seem that a public warehouseman is as much within the statutory designation of an "officer" as any of the other persons specified therein. And the amendment of 1891 to include "executors, administrators, etc., and depositories" would seem to have been made in view of the decision in State ex rel. v. Darby, 11 Mo. App. 528, holding that the statutory remedy against a principal debtor for money paid by a surety did not embrace sureties on a guardian's bond or the bond of a trustee under a will. Moreover, as the bond involved in the case at bar is a statutory bond, defendant must be deemed to have contracted with plaintiff in contemplation of the latter's statutory right to obtain its discharge. [Zellars v. National Surety Co., 210 Mo. 86, 92.] As the statute, section 12699 (section 2943, R. S. 1929) provides for the surety's discharge, and section 12703 (sec. 2947, R. S. 1929) says the court shall hear the application and may in its discretion, make an order requiring the principal to give a new bond, etc., it would seem that the court in the exercise of a sound judicial discretion is required to grant the discharge where the facts warrant it. While this last section puts it in the discretion of the court, no such discretion is mentioned in section 12699, and in this case no rightful or proper discretion would deny a plaintiff a right, not only preserved in the contract but given by the statute, where it clearly appears the rights of the public will not be jeopardized and the defendant is able to give a new bond. Whenever a statute provides that a court shall be invested with discretion, it means a sound judicial, and not an arbitrary, discretion. In a case where not only the wording of the contract expressly reserves the surety's common law right, but the statutes provide an affirmative method by which the surety can be discharged from future liability, and that too without injury to the rights of the public, it would be an arbitrary abuse of discretion to deny the surty its rights so carefully and expressly granted. It is said that plaintiff must assign a good reason for its withdrawal as surety. The clause in paragraph 4 however says the surety "shall have the right to withdraw or cancel same whenever it shall see fit, and in any event, the Company shall not be required to disclose the reasons upon which its action was based," etc. However, since the proceeding to obtain the discharge is according to the statutory method, and as one of the sections (sec. 12700, R. S. 1919, now sec. 2944, R.

S. 1929) says the petition "shall set forth the facts upon which the application for a discharge is founded" no doubt this requirement must be complied with. The petition for discharge, after reciting the giving of the bond under the provision in paragraph 4 of the contract whereby the surety should have the right to withdraw or cancel same whenever it shall see fit (which is one reason), further recited "that said Simonds-Shields-Lonsdale Grain Company has failed and refused to pay to your petitioner; that your petitioner desires to be discharged from all future liability on said bond; that notice, in writing, of your petitioner's intention to file this petition together with a copy of this petition, was served upon said Simonds-Shields-Lonsdale Grain Company on the 29th day of May, 1928, as required by section 12701 of the Revised Statutes of the State of Missouri, 1919; that a copy of said notice, together with the proof of service thereof, is attached hereto, made a part hereof and marked Exhibit "A."

"Wherefore, your petitioner prays that an order be made requiring the principal in said bond, Simonds-Shields-Lonsdale Grain Company, to give and file a new bond to the end that your petitioner may be discharged from *all liability arising subsequent to the approval and filing of said new bond.*" (Italics ours.) The petition was duly signed and supported by affidavit.

Clearly, the premium for the year beginning February 2, 1928, which the petition alleges the defendant has failed and refused to pay, is the premium demanded for that year by plaintiff about which they had the controversy shown in evidence, and which defendant did refuse to pay. It would seem that the petition did comply with the statute and set forth the facts on which the application was founded, especially as there was no attack of any kind whatever made upon the sufficiency of the petition, and the refusal of the court to act was not based upon any claimed insufficiency of the petition.

The evidence shows that the Towner Rating Bureau is a statistician for all surety companies, keeping files of their experience and business, and that the rates promulgated by it are based on the average experience of all such companies. There is no question but that the Towner Rating Bureau had increased the premium for a bond of this character from $62.50 to $181.25, and no attempt whatever was made to show that the increased premium after the year 1926 was improper or was not based on the actual average experience of the companies. In view of the requirement that warehousemen or elevatormen should charge rates that are uniform it is manifest that the premium rates for bonds necessary in the carrying on of such business should also be uniform, else a warehouseman or elevatorman having to pay only $62.50 per annum for what others had

to pay $181.25, would have an unfair advantage and would either make a larger return on the business or charge lesser rates than would others not so fortunately situated. It is said the plaintiff has not shown that the lesser rate of $62.50 is in any way inadequate. The evidence, however, that the larger rate is justified and supported by the average experience of all companies in the surety business tends to show that the smaller premium is not adequate, at least sufficiently so as to throw upon the *defendant* the burden of going forward with proof to show that the said smaller amount is adequate. Nothing of this kind was done or attempted.

A number of cases are cited in defendant's behalf holding that mere "inadequacy of price" is no ground for setting aside a contract in equity, but of course they are not contracts such as the one involved herein, which, in itself and under the law, reserved to the surety of an indefinite period (making the relationship one terminable at will), the right to cancel the bond for that or any other reason, or for no reason at all except the surety's desire to be released.

But defendant contends that as plaintiff on January 10, 1928, wrote McCluer-Wilbur Underwriting Company in relation to the expiration of the defendant's bond on February 2, 1928, and stated that they would charge their account with the renewal premium of $62.50 on defendant's bond for the year beginning on that date unless they heard to the contrary, and that as the defendant paid to the McCluer-Wilbur Underwriting Company on February 3, 1928, the $62.50 to be paid plaintiff, this was itself a contract to carry the bond for that year at the old rate, and for this reason plaintiff is not entitled to any relief. This contention proceeds upon the theory that McCluer-Wilbur Underwriting Company were the agents of plaintiff and not defendant, so that a payment of said $62.50 premium to said McCluer-Wilbur Underwriting Company would, in law, be a payment to plaintiff, thus, in that event, binding them for another year at the old rate. But McCluer-Wilbur Underwriting Company were not plaintiff's agents but were the agents of defendant. This arises from the very nature of the services rendered by the Underwriting Company. So far as the correspondence and dealings between plaintiff and the Underwriting Company are concerned they show that, as between themselves, they did not regard themselves as occupying the relation of principal and agent. The McCluer Company refer to defendant as "our client" and speak of plaintiff as "Your Company" and give reasons why the plaintiff should continue the bond at the old rate because they had done so for a period of time without complaint. Doubtless, the statements made by these parties to each other could not bind the defendant as to whose agent the McCluer Company was. But the *testimony* of these persons,

not controverted in any way, would be evidence and this shows that the McCluer Company was not plaintiff's agent. Besides, if defendant's letter of January 10, 1927, be one in fact written in 1928 (of which there is no evidence), it tends to support the inference that defendant was dealing with the McCluer Company as *its* agent. Wilbun testified positively that he never did represent the plaintiff. Moreover, it is clear that before any attempt on defendant's part to notify the plaintiff, and before anyone did notify plaintiff, that the defendant would take the bond for the ensuing year at the old rate, plaintiff notified McCluer-Wilbur Company that they could *not* accept the old rate, but that having learned the new rate was the correct one, they insisted upon it and refused to agree to accept the old rate.

Moreover, the trial court did not refuse to grant plaintiff relief on the ground that the parties had made a contract as to the year beginning February 2, 1928. The court seemingly based its action upon the ground that the bond of a public warhouseman is *not* the bond of a depository within the meaning of section 12699, Revised Statutes 1919, and that a public warehouse as conducted by defendant is not a depository within the meaning of said statute and that the bond is not of a character within the purview of said section. For the court refused to give the two following declarations of law in reference to those matters, as follows, to-wit:

"Declaration of Law.

"The court declares the law to be that the bond of a public warehouseman is the bond of a depositary within the meaning of section 12699, Revised Statutes of Missouri, 1919, and that if the court finds from an examination of the application filed by the petitioner herein and from the evidence that at the time the defendant obtained said bond from the petitioner, defendant agreed in writing with the petitioner that the petitioner might withdraw as surety in said bond at any time it might see fit, then an order should issue herein requiring the defendant to give a new bond in accordance with the law in such cases made and provided."

"(Refused.)"

"Declaration of Law.

"The court declares the law to be that a public warehouseman's bond of the character shown in evidence in this case comes within the purview of section 12699 to section 12707, Revised Statutes of Missouri, 1919, and that a public warehouse such as that conducted by the defendant herein is a depositary within the meaning of section 12699, Revised Statutes of Missouri, 1919."

"(Refused.)"

In view of all that has been stated herein, the judgment should be reversed and the cause remanded with directions to enter judg-

ment in plaintiff's favor, and ordering defendant to file a new bond to the end that plaintiff may be discharged from all liability arising subsequent to the approval and filing of said new bond, saving to the public and the members thereof all right, theretofore accruing under the old bond. It is so ordered. All concur.