NATIONAL SURETY CORPORATION, A CORPORATION, APPELLANT, v. ESTATE OF NANCY GENE BURGER, A MINOR, RESPONDENT.—186 S. W. (2d) 510.

St. Louis Court of Appeals. Opinion filed March 20, 1945.

Respondent's Motion for Rehearing Overruled April 17, 1945.

Petition for Writ of Certiorari Denied June 4, 1945.

*Fordyce, White, Mayne, Williams & Hartman* and *Walter R. Mayne* for appellant.

732

*Thompson, Mitchell, Thompson & Young* and *R. Forder Buckley* for respondent.

734

McCULLEN, J.—This proceeding was instituted by appellant in the Probate Court of St. Louis County, Missouri, for the purpose of procuring an order of that court discharging it from future liability

under a curator's bond which it executed for respondent estate in the sum of $30,000 and filed in said court. The petition was heard by the probate judge and denied, whereupon an appeal was taken to the Circuit Court of St. Louis County, where it was tried by the court resulting in a judgment denying the relief sought. Appellant appealed to the Supreme Court but that court held that it did not have jurisdiction of the cause and transferred it to this court. [See National Surety Corporation v. Burger's Estate (Mo.), 183 S. W. (2d) 93.]

Appellant's "Petition for Discharge From Future Liability Under Bond of Co-Curator and Co-Curatrix" is based upon two grounds, as follows:

"Your petitioner further represents that prior to the execution of the aforementioned bond by your petitioner, the said Imogene Burger and A. C. Burger entered into a written contract with petitioner providing, in part, that they would, upon the request of petitioner, procure petitioner's discharge from liability under the aforesaid bond, and granted to your petitioner the right at any time to take such steps as it may deem necessary or proper to procure its discharge from liability; and that your petitioner has made demands upon the said Imogene Burger and A. C. Burger to procure petitioner's discharge from liability, but that said demand has not been complied with.

"Your petitioner further represents that prior to the execution of the aforementioned bond it was given to understand that the assets of this said estate consist of cash and securities in the sum of twenty-seven thousand and no/100 ($27,000) dollars, and that it was not until after said bond was signed and filed with this court that it was ascertained by your petitioner that the assets of this said estate consist of an interest in the South Side Buick Company, a partnership; that assets of such nature impose upon your petitioner a liability beyond the scope of that which it is willing to assume; and that for such reason your petitioner desires to be relieved from future liability under said bond."

The answer of A. C. Burger and Imogene Burger, co-curators of the respondent estate, admitted that appellant executed, as surety, a bond in the penal sum of $30,000, said co-curators being principals therein, conditioned for the faithful discharge of their duties as curators of the estate of Nancy Gene Burger, a minor, according to law, and that said bond was filed with and approved by the Probate Court of St. Louis County on August 8, 1941. The answer denied that said co-curators had entered into a written contract prior to the execution of the bond, and alleged that even if such contract had been entered into it did not entitle appellant to be discharged from said bond, which runs in favor of the State of Missouri for the use of said minor. The answer also denied that appellant had been given to understand that the assets of said estate consisted of cash and securities

in the sum of $27,000; denied that it was not until after the bond was signed and filed in court that appellant ascertained that the assets of the estate consisted of an interest in the South Side Buick Company, a partnership, and alleged that the appellant's attorney in fact was told prior to his execution of said bond that the assets of said minor's estate consisted solely of a one-third interest in South Side Buick Company, a partnership, and a one-third interest in Community Motors, a partnership.

Further answering, the co-curators alleged that this proceeding is cognizable only in a court of equity; that it was instituted in the Probate Court of St. Louis County, which has no equity jurisdiction, and that the jurisdiction of the Circuit Court of St. Louis County being purely derivative, said circuit court had no jurisdiction to entertain the proceeding.

The evidence shows that prior to August 8, 1941, A. C. Burger and Imogene Burger, his wife, each owned a one-half interest as partners in two automobile sales agencies in the City of St. Louis. The two agencies were the South Side Buick Company and the Community Motors. Mr. and Mrs. Burger decided each to transfer a one-sixth of their respective interests in the businesses to their daughter, Nancy Gene Burger, who was at that time twelve years old. They employed for that purpose Richard C. Hart, an attorney at law, and he with George W. Rodway, an accountant who had handled all book accounting matter for Mr. and Mrs. Burger, proceeded to put the plan into effect. Mr. Hart prepared the necessary assignments to be executed by Mr. and Mrs. Burger wherein each was to assign a one-sixth interest to the minor daughter. Before the papers were signed however, it was decided that it was necessary that a minor's estate be opened in the St. Louis County Probate Court for the daughter, inasmuch as she was to be the owner of a one-third interest in each of the two businesses. The actual execution of the papers was to be dependent on whether Judge Stahlhuth, Probate Judge of St. Louis County, would agree to the proposed arrangements and would appoint Mr. and Mrs. Burger co-curators of the minor's estate.

Mr. and Mrs. Burger, accompanied by Mr. Rodway and Mr. Hart, met with Judge Stahlhuth on the morning of August 8, 1941, in the Probate Court of St. Louis County. The plan of making the assignments to the minor daughter of Mr. and Mrs. Burger was discussed with Judge Stahlhuth who was told by Mr. Hart and Mr. Rodway that the assets of the minor's estate would consist of interests in the two partnerships. Judge Stahlhuth was also told the value thereof. The papers that had been prepared were shown to Judge Stahlhuth, who consented to appoint Mr. and Mrs. Burger as co-curator and co-curatrix provided they would furnish a surety company bond in the amount of $30,000. An application for letters of curatorship was prepared naming the father as co-curator and the mother as co-curatrix

of the estate of their minor daughter. Mr. Rodway then called the office of Lon W. Harlow & Company in the City of St. Louis and inquired if the company would execute the required surety bond. In about forty-five minutes after Rodway called, appellant's representative, Mr. Paul J. Hellweg, arrived at the Probate Court in St. Louis County, having with him power of attorney for National Surety Corporation, appellant herein, to sign the required bond.

It appears that none of the papers transferring the interest of the Burgers to their minor daughter was signed until after Hellweg had agreed that he would sign the $30,000 bond on behalf of National Surety Corporation, the appellant herein, and after Judge Stahlhuth had indicated that he would make the appointment of Mr. and Mrs. Burger.

Appellant claims that after the application for the bond was signed by the Burgers the bond itself was then executed by Mr. Hellweg and filed with the court. It is claimed for respondent that there is no testimony to show whether the bond was signed first by Hellweg or the application was signed first by the Burgers. The record shows that Mr. Burger testified that all the papers were signed after Hellweg had prepared the application and the bond, and that all papers were signed at the same time. Hellweg testified that the application for the bond was signed simultaneously with the execution of the bond, but later on he testified that he couldn't remember whether the Burgers signed the application first or whether he (Hellweg) signed the bond first; that it all happened there at the counter at the same time.

The evidence shows that Hellweg was secretary of Lon W. Harlow & Company, which company was general agent for various surety companies, including the National Surety Corporation; that Hellweg had been in that business for twenty or twenty-one years and had been an attorney in fact for National Surety Corporation since March, 1931, and had for more than ten years signed, on behalf of said corporation, curators', guardianship and executors' bonds; that he signed or refused to sign such bonds in the probate courts, using his own judgment without consulting anyone else; that he was the surety bond man in the Lon W. Harlow & Company office. Robert L. Edgar, vice-president and manager of Lon W. Harlow & Company, testified that Mr. Hellweg was in charge of that company's bond department.

Although it is not disputed that Hellweg kept the only copy of the application for the bond, it was not contended in the probate court or in the circuit court that Mr. and Mrs. Burger had not read or did not fully understand the application for the bond which they signed. The evidence shows that on this matter they relied upon the advice of Hart, their attorney, at the time they executed the application for the bond. Said application was a printed form customarily used in connection with such bonds and it was furnished by Hellweg. A number of questions on the application were required to be answered and the

answers were filled in by Hellweg in his own handwriting. One question on the application for the bond was: "Describe fully all the assets and liabilities of the estate." The answer to said question was filled in by Hellweg as follows: "Personal Estate $27,000." Hellweg testified that he had been told by Rodway that the assets of the estate would consist of personal property in said amount. At one point in his testimony Hellweg testified that Rodway told him that the assets of the estate consisted of "personal property" of approximately $27,-000. Later Hellweg testified that Rodway said that the assets of the estate consisted of "cash and personal property" of approximately $27,000. Hellweg further testified that he did not have any conversation with Mr. and Mrs. Burger with respect to the property in the estate; that the only conversation he had with them with respect to the application for the bond was when he asked them to sign it after he had prepared it; that the only information that he requested or obtained from Hart, attorney for the Burgers, was as to where the bill for the bond premium was to be sent; that he did not ask Hart for information as to the nature of the personal property making up the estate, but asked Hart to furnish him with a copy of the inventory; and that he did not that morning ask anyone for a breakdown of the $27,000 into its constituent elements.

Mr. Burger testified that Hellweg did not ask him any questions about the estate, and Mrs. Burger testified that she had no conversation with Hellweg at all that morning.

Rodway testified that before the bond was signed by Hellweg, he (Rodway) told Hellweg that the assets of the estate consisted of a one-third interest in Community Motors and a one-third interest in South Side Buick, and that if Hellweg wanted statements he could get them from Rodway's office at any time. Rodway emphatically denied that he told Hellweg that the estate consisted of "cash and securities" in the amount of $27,000, and was positive that he told Hellweg that the assets of the minor consisted of a one-third interest in the partnerships of South Side Buick and Community Motors, and told him that it amounted to $27,000 total, one interest being worth $15,000 and the other worth $12,000. Rodway further testified that Hellweg did not inquire as to where the assets of the estate were or who was going to hold them.

The evidence shows that under question thirteen in the application for the bond there were blank spaces for the following items: "Stocks; Mortgages; Bonds; Money and Where Deposited; All Other Personal Property," and that Hellweg wrote over these spaces "$27,000." Hellweg was asked on cross-examination why, if he was told that the assets consisted of "cash and personal property," he did not make inquiry as to how much of the personal property was stocks, how much was mortgages, how much was bonds, how much was money, and how much was other personal property, and answered that it was not nec-

essary to obtain that information at that time because he had been told he would be furnished later with a copy of the inventory. It further appears that the application contained space for information to be given as to the assets of Mr. and Mrs. Burger, but that this requirement was waived by Hellweg who testified that he was willing to write the board without knowing whether Mr. or Mrs. Burger had five cents or a million dollars.

The evidence shows that after Hellweg arrived at the probate court on the morning mentioned he wrote the bond in question and calculated the amount of the annual premium to be $160, which amount appears in the application and also was written by Hellweg on the face of the bond. A notation in print appeared on the face of the application for the bond, as follows: "Agent must submit this application to Home Office and await approval before execution IF (1) applicant is indebted to the estate, or (2) the estate will not be closed within five years, or (3) any mercantile business is to be conducted under the bond." Hellweg testified that notwithstanding said instructions on the application he did not wait for approval from the home office because it was not necessary.

Question No. 15 on the application was as follows: "Does the estate own any unincorporated business or any interest therein?" The record shows that Hellweg did not ask this question of anyone. Hellweg testified that he and Mr. Hart were still in the probate clerk's office when he learned for the first time from Mr. Hart that the assets of the estate consisted of the partnership interests; that this was a few minutes after the bond had been executed.

Hart testified that after leaving the probate court on the morning in question Hellweg commented on the unusual nature of the curatorship assets and asked for copies of the agreements, but did not say anything about his company desiring to get off the bond either in the courthouse or when he and Hellweg later rode downtown together that morning, and that Hellweg did not say that he would not have signed the bond if he had known that the estate consisted of interests in the partnerships; that on August 19, 1941, he (Hart) sent to Hellweg a copy of the partnership assignments covering the South Side Buick and advised Hellweg that Community Motors was the same except for its net worth; and that under date of August 29, 1941, he (Hart) received a bill for the bond premium which he turned over to Mr. Burger; that on September 2, 1941, a Mr. Hennessy came from the bonding company and told him that the bonding company wanted collateral; that on September 5, 1941, Hennessy came back to him and said that the bonding company would have to have collateral or the company proposed to get off the bond. The evidence shows that Mr. Burger paid the first bond premium with his check, which was dated October 10, 1941, and which cleared October 15, 1941.

It·will be remembered that in the answer, filed on behalf of the respondent estate, the co-curators alleged that this cause was cognizable only in a court of equity and that the petition having been filed in the probate court, which has no equity jurisdiction, the circuit court acquired no jurisdiction to entertain the proceeding on appeal. In this court respondent takes a position directly opposite and says: "This proceeding is clearly legal in its nature, not equitable," and argues that the parties and the trial court treated the matter throughout as a proceeding at law and not in equity. It is true, as stated by respondent, that the circuit judge said that the proceeding was legal and not equitable, and that appellant requested the trial court to give a declaration of law, the refusal of which appellant assigns as error in this court, thus indicating that appellant regarded the case as one at law. It is also true that the proceeding was originally brought in the probate court which has no direct equitable jurisdiction. However, the probate court does have jurisdiction of this kind of a case because the statute, Section 3330, *infra*, specifically authorizes the bringing of such an action in that court. Said statute reads:

"Any person bound as surety in any bond given by any officer, including executors, administrators, guardians, curators, assignees, receivers, trustees and depositories, to secure the faithful performance of the duties of such officer, *may, on his petition in writing addressed to the court authorized by law, for the time being, to take and approve such official bond,* be discharged from all future liability on such official bond." (Italics ours.)

Section 3331, Revised Statutes Missouri, 1939 (Mo. R. S. A., sec. 3331), provides that: "The petition shall set forth the facts upon which the application for a discharge is founded, and shall be verified by the affidavit of the petitioner thereto annexed."

Section 3332, Revised Statutes Missouri, 1939 (Mo. R. S. A., sec. 3332), provides: "A notice, in writing of such intended application, together with a copy of the petition, shall be personally served on the principal in the bond, at least fifteen days before the making of the application."

Section 3333, Revised Statutes Misouri 1939 (Mo. R. S. A., sec. 3333), provides: "If the principal in the bond shall be absent from the State for the period of six months, the publication of the notice and petition in some newspaper printed in the State, for four weeks successively, shall be sufficient service of the notice."

Section 3334, Revised Statutes Missouri 1939 (Mo. R. S. A., sec. 3334), provides: "The court to whom the petition is addressed shall hear the application, and may, on examination thereof, in its discretion, make an order requiring the principal in such bond to give a new bond, with sureties for the performance of his official duties."

Section 3330, *supra*, requires the petition to be addressed "to the court authorized by law, for the time being, to take and approve

such official bond." It is not contended that the probate court did not have authority to take and approve the bond involved in the case at bar, hence the petition of appellant asking for relief was properly filed in that court in the first instance. The action is, therefore, a statutory proceeding in which, because of the nature of the relief sought, the court is required to apply equitable principles, just as many other proceedings in the probate court, although based upon statute, nevertheless involve the application of equitable principles.

In the absence of statute, plaintiff's petition for discharge from future liability under the bond would undoubtedly be cognizable only in a court of equity, which means that plaintiff would have been required to bring his action in the circuit court in the first instance, that being the court which, under our system, has jurisdiction in equity as well as at law. Absent the statutes, Section 3330 et seq., *supra*, the action would have been tried in the circuit court as one in equity and, therefore, without a jury. On appeal from the circuit court it would have been triable *de novo* in the appellate court with authority in the appellate court to reach its own conclusions in rendering judgment, notwithstanding the rule that due deference will be given by an appellate court to the judgment of the circuit court in equitable proceedings. However, the statutes, Sections 3330 et seq., *supra*, specifically give to the probate court jurisdiction to hear and determine applications by sureties to be discharged from "future" liability under bonds, and there is no contention that the Legislature exceeded its constitutional powers in enacting such statutes. With respect to the right of the probate court to apply equitable principles in matters over which it is given jurisdiction by statute, this court, in a recent case said:

"It is of course true that probate courts in this State possess no inherent equitable jurisdiction, but, as we have already pointed out, it has always been recognized that they may apply equitable principles in the exercise of the statutory jurisdiction with which they have been invested." [State ex rel. Kemp v. Arnold, 234 Mo. App. 154, 161; 113 S. W. (2d) 143, 147.]

This doctrine of the applicability of equitable principles in a statutory proceeding is found in actions for divorce in the circuit court. Our Supreme Court has held that although divorce is statutory in this country, where not otherwise provided by statute our courts generally follow rules of equity, and that a divorce suit is a proceeding *sui generis* with a practice similar to equity in that no specific finding of fact is required and an appellate court determines the case *de novo* and is not bound by the finding of the court below, but may make a different finding of its own. [State ex rel. Couplin v. Hostetter, 344 Mo. 770, 129 S. W. (2d) 1.] We are of the opinion that, in so far as the nature of the action and scope of review are concerned, this statutory action is analogous to a divorce action in that it is au-

thorized by statute to be brought in the court wherein the bond was taken and approved, and that court is given power in its discretion to relieve a surety from future liability under a bond. Having been instituted in the probate court, from which an appeal lies to the circuit court, it was triable *de novo* in the circuit court as well as in this court on appeal from the circuit court. The action of the parties in waiving a jury was in our opinion an erroneous proceeding and can have no effect in determining the scope of review in this court on appeal. Holding this view of the case, it is unnecessary for us to discuss the authorities cited by respondent in support of the contention that this is a case at law wherein we are bound by the judgment of the trial court, if based on substantial evidence.

It appears from the record herein that appellant gave the co-curators of respondent estate a notice in writing of its intention to present its petition for discharge from future liability under the bond, as required by section 3332, *supra.* It also complied with the provisions of section 3331, *supra,* in that it stated in its petition the "facts upon which the application for a discharge is founded," namely, the agreement of the co-curators in paragraph six of the application for the bond. The question for determination, therefore, is whether or not the court was required, in the exercise of its judicial discretion, to make an order requiring the principals in the bond to give a new bond with a different surety and to discharge appellant from future liability under the bond involved herein.

In a case decided by the Kansas City Court of Appeals the Massachusetts Bonding & Insurance Company brought an action seeking to be discharged from future liability under a bond of $25,000 executed by the defendant therein as a public warehouseman to the State of Missouri. There was a judgment for the defendant in the trial court and the bonding company appealed. The application for the bond had been made by the defendant therein upon a form prepared by the plaintiff bonding company in which the following paragraph appeared:

"The Company may decline to become surety for the applicant; and in case it does act as surety it shall have the right to withdraw or cancel same whenever it shall see fit; and in any event the Company shall not be required to disclose the reasons upon which its action was based, and shall not be responsible for any loss or damage that the applicant may sustain by reason of such action."

The bond was conditioned for the faithful performance of the defendant's duty as public warehouseman. The Kansas City Court of Appeals in a well-considered opinion by TRIMBLE, P. J., held that the word "discretion" appearing in the statute, now section 3334, *supra,* meant a sound judicial discretion, and pointed out that although said statute puts it in the discretion of the court, no such discretion is mentioned in the section which is now 3330, *supra,* and said: "and in

this case no rightful or proper discretion would deny a plaintiff a right, not only preserved in the contract but given by the statute, where it clearly appears the rights of the public will not be jeopardized, and the defendant is able to give a new bond. . . . *In a case where not only the wording of the contract expressly reserves the surety's common-law right, but the statutes provide an affirmative method by which the surety can be discharged from future liability, and that, too, without injury to the rights of the public, it would be an arbitrary abuse of discretion to deny the surety its rights so carefully and expressly granted."* [Massachusetts Bonding and Ins. Co. v. Simons-Shields-Lonsdale Grain Co., 226 Mo. App. 1071, 1083, 49 S. W. (2d) 645, 651.] (Italics ours.)

In the case at bar appellant not only had the right, under the statute, sections 3330 et seq., to bring its action to be relieved from future liability under the bond, but it also was entitled to be relieved from such future liability by virtue of paragraph six of the application for the bond, which was signed and agreed to by the co-curators. Said paragraph six provides as follows:

"The Indemnitor will, on request of the Corporation, procure the Corporation's discharge or the Corporation may at any time take such steps as it may deem necessary or proper to procure its discharge from any and all liability under said bond and shall, at its option, have the right to use the Indemnitor's name and to all rights and privileges of the Indemnitor and to be discharged from liability for the future default of the Indemnitor and to require the Indemnitor to account and give new surety or sureties, and/or to secure, and further indemnify itself against loss, all without any liability to or waiving any rights it may have against the Indemnitor, and all damages and expenses which the Corporation may sustain or incur or be put to in obtaining such discharge, or in further securing itself against loss, shall be borne and paid by the Indemnitor immediately upon demand by the Corporation."

The "Indemnitor" means the co-curators as principals in the bond, and the "Corporation" means the appellant surety corporation.

Chapter 17, Revised Statutes Missouri 1939 (Mo. R. S. A., chapter 17), which contains sections 3330, 3331, 3332, 3333 and 3334, *supra,* is entitled "Sureties and Their Discharge." The above sections show a clear purpose on the part of the Legislature to provide a method for discharging sureties from future liability on bonds while at the same time giving protection to the principals, in the bond and the public by requiring the surety to give notice in writing of intention to be discharged from future liability, and to set forth the facts upon which the application for discharge is founded. The matter is then publicly heard by the court which gives the principals in the bond, and others who may have an interest, an opportunity to show the court good cause why the surety should not be discharged.

Respondent contends that the application for the bond is a separate contract and is not a part of the bond and is, therefore, entitled to no consideration in this proceeding. We are unable to agree with respondent's view on this point. The evidence shows that the principals were requested to furnish a new bond in accordance with the terms of said agreement. An argument, similar to that presented by respondent herein, was presented in the case of Massachusetts Bonding & Ins. Co. v. Simonds-Shields-Lonsdale Grain Co., *supra*, by the defendant bonding company therein. In ruling against such contention the court said that the application for the bond could be considered as a separate document in any proceeding wherein the rights of third parties for whose benefit the bond was given should be concerned, but that where the question is solely what are the rights of the parties *inter sese* with regard to the relation of principal and surety existing between them by reason of the bond and the continuance of that relation, the application for the bond is the controlling portion of the contract, subject, however, to the rights of the public. The court pointed out that in a controversy solely between the principal and the surety, the application for the bond is the controlling feature of the contract, and, in the very nature of things, an important element of the contract as well as a weighty inducement leading the surety to agree to enter into the obligations of the bond without which the surety might reasonably, and doubtless would, refuse to enter into the bond; that under any other view the surety would become a perpetual surety, regardless of the changed conditions which the distant future might bring forth, such as the increased cost of furnishing such suretyship, or any other of the innumerable changes to which the infinite variety of human circumstances may subject the parties to the bond as principal and surety. The court said:

"It would seem that no company would be willing to enter into bond without such reserved right to cancel, and hence the rule that no such right exists would have a tendency to greatly increase the difficulty of giving such a bond, or defeat its giving entirely. As we view this contract, plaintiff had a right, within the accrued rights of the public if any did accrue or were likely to be affected, to terminate the suretyship for any reason, or for no reason except its desire, or rather election, to cancel or terminate the relation. *The rights of the members of the public are in no wise interfered with, nor is there any possibility of their being affected since there is no showing of that kind but to the contrary, and, if there should be, the order of the court is discharging the surety could save and reserve such rights, if any, arising during the existence of the present bond, or later growing out of it while it did exist.*" [Massachusetts Bonding & Ins. Co. v. Simonds-Shields-Lonsdale Grain Co., 226 Mo. App. 1071, 1080, 1081, 49 S. W. (2d) 645, 650.] (Italics ours.)

Respondent argues that the only method by which a surety may be relieved from a bond, such as the one involved herein, is by strict compliance with the statute. A number of authorities are cited in support of this contention. We think that appellant did all the things required by statute to give the court jurisdiction and presented facts to warrant a judgment for the relief prayed for. We are also of the opinion that there was no evidence to justify a denial of such relief. Respondent does not point out wherein there was any failure to comply with the statutes, but takes the position that the court properly exercised its discretion by denying the petition and that its ruling is binding on appeal. In this connection respondent cites and quotes from the case of Hartford Accident and Indemnity Co. v. White (Tenn.), 115 S. W. (2d) 249. Section 9605 of the Tennessee Code, then in effect, provided:

"Upon such petition and notice, the court may compel the principal to give other sufficient security, or counter security, to be approved by the court, or to deliver up the estate to the petitioner, or such other person as may be directed, and may make such other orders and decrees for the relief of the petitioner and better security of the estate as may be just and equitable."

The Tennessee court held that, apart from the statute, the surety therein had no inherent absolute right to be released from further liability on the bond in question. The bond involved in said case had been executed by the surety pursuant to an application containing a provision similar to that in the case at bar. It was as follows:

"VI. That the undersigned will, on request of the Surety, procure the Surety's discharge from liability under said bond, and the Surety shall, at its option, have the right to the use of the undersigned's name, and to all rights and privileges of the undersigned, and, at any time, shall have the right to be discharged from liability for the further default of the undersigned, and to require the undersigned to account and give new surety or sureties."

Referring to the above provision in the application, the Tennessee court held that it was "one sided" and nothing more or less than an effort on the part of the appellant to reserve the unrestricted right of cancellation at its pleasure. Further referring to the application for the bond, the court said:

"It is first to be noted that this contract, while in the application, is not in the bond. The appellant and appellee were not the only parties to the latter contract. The beneficiaries of the estate are likewise parties in a very real sense of the word. The private agreement between the appellant and the appellee was not binding upon them." [Hartford Accident & Indemnity Co. v. White (Tenn.), 115 S. W. (2d) 249, 254.]

We are unable to agree with the views expressed by the Tennessee court in the above case wherein it holds that the application for the

bond does not bind the principal and surety *inter sese* in a controversy solely between themselves as to their respective rights and obligations in that relationship. We think that the decision of the Kansas City Court of Appeals in the Massachusetts Bonding & Ins. Co. case, *supra*, which we have referred to at length, is based on sounder reasoning. It also gives effect to the statutes, *supra*. Furthermore, we believe that the actual decision of the Tennessee court was based almost entirely on the failure of the surety company therein to return any portion of the annual premium on the bond that it had collected. The court referred to the fact that no offer had been made to return any portion of the annual premium and said that if the surety's position to the effect that the probate judge had no discretion in the matter and that the surety's right to be relieved from further liability was absolute upon the filing of the petition and notice, then it would follow that the surety would have had the same right on the next day after the bond was executed and accepted, or at any time thereafter, and would have at the same time the right to retain the premium which had been paid to it for having undertaken the risk for a year; that the result would be that the principal would be put to the expense of furnishing an additional bond as well as expense for the accounting which would be required. The court then concluded that part of its opinion by saying:

"We may thus conceive a series of sureties on successive bonds exacting premiums for the assumption of a risk for a specified period and being relieved of liability under the statute prior to the expiration of that time, and in this manner burdening the principal or the estate, or both, with the payment of a number of premiums and the expense of a series of compulsory accountings." [Hartford Accident & Indemnity Co. v. White (Tenn.), 115 S. W. (2d) 249, 252.]

We do not have any such situation in the case at bar. In this case the evidence shows that the premium on the bond involved herein was accepted by appellant with the express understanding that no rights of the appellant should be waived thereby, and with the further express understanding that in the event the appellant should be successful in being discharged from future liability on the bond involved there would be a refund of the unearned portion of the premium. Furthermore, even though appellant had not expressly agreed to refund any unearned premium, it would nevertheless be liable for such unearned premium upon being discharged from future liability on its own application.

Referring again to the application herein which was signed by the co-curator and co-curatrix, we find that it was specifically stated therein: "The undersigned hereby request National Surety Corporation to become Surety on the bond as Co-Curator and Co-Curatrix in the amount of $30,000, and if the Corporation shall execute said bond the undersigned agree to pay $160 premium upon execution of said bond,

and $160 annually thereafter in advance, . . . '' It is thus clearly evident that in its effect the application for the bond necessarily preceded the execution of the bond. The very existence of such an application signed by the co-curators containing such a request shows conclusively that it was the intention of the parties that the bond should be based upon the application. As between the principals and the surety, the application is the very foundation of their relationship. It is to the application that we must look in order to find the agreement between the parties as to the amount of the annual premium to be paid for the bond. It is only in the application for the bond that we find the information necessary to be given to the proposed surety to enable it to execute the bond. Without the application the surety would have no binding assurance as to the correct names and addresses of the proposed principals, or as to other necessary information concerning the proposed principals and the estate which they were to have in charge in their capacity as co-curators. The application was also necessary as the foundation of appellant's right to collect the annual premiums for acting as surety on the bond. Therefore, this being a controversy solely between the principals and the surety in regard to their respective rights and obligations, it is not only proper, but necessary, to consider the documents that were executed by both principals and surety in creating the relationship of principals and surety between them.

Respondent argues that appellant can be granted relief only on the condition that the principals give a new bond and that the evidence shows that such a new bond could not be obtained; that if the principals should fail to give a new bond within sixty days they would, under the statute, Section 3337, Revised Statutes Missouri 1939 (Mo. R. S. A., sec. 3337), be removed from their position as co-curators of the estate of the minor child, and that the court would be required to certify the vacancy to the Probate Court of St. Louis County, which vacancy should be supplied according to law. It is true that Hellweg, who acted for appellant in executing the bond, testified on cross-examination that he did not know where the Burgers could get a new bond of this type if appellant should get off the bond as surety. There is no doubt that the co-curators might have difficulty in procuring another such surety on a bond, but that difficulty is necessarily inherent in the nature of the arrangement that the co-curators designed for the benefit of their minor daughter. They chose that method themselves. They were the donors of the gifts which make up the assets of the estate of the minor, and decided that they would have themselves named as co-curators, which shows that they understood that the minor was legally incompetent to enter into contracts such as would be involved in having her as a partner or owner of an interest in a going business. As we see it, the fact that the co-curators may have difficulty in getting a different surety on their bond will not be

due to the act of appellant herein or of the court in discharging appellant from future liability on the bond, but will be due to the nature of the arrangement made by the co-curators themselves. However, even though there may be difficulty in carrying out their arrangements as they originally intended it, we do not think that is a good reason for refusing to discharge the surety from future liability on the bond, in accordance with the agreement which the co-curators entered into when the bond was executed, especially since everyone interested will be fully protected by appellant's suretyship up to the time of appellant's discharge, and even thereafter for any breach occurring during the period the bond was in effect.

Inasmuch as the co-curators agreed in their application for the bond that the surety might at any time take such steps as it should deem necessary or proper to procure its discharge from future liability under the bond, we see no reason why that agreement should not be enforced, especially since there is no evidence whatsoever in this record to show that the rights or interests of the minor or of any person, or of the public, will be adversely affected thereby. Furthermore, even if it be shown that any such rights or interests might be adversely affected, the judgment of the court will afford complete protection under the bond because the judgment will discharge and release appellant only from future liability under the bond, and will not and cannot affect the rights of any person or the public which shall have arisen or accrued prior to the date that the judgment is entered granting such discharge.

We are of the opinion that appellant cannot lawfully be compelled to remain as surety on said bond against its will in the face of paragraph six of the application and appellant's compliance with the statutory requirements, any more than it could have been compelled to become surety thereon against its will in the first instance.

In view of the conclusion which we have reached, it is unnecessary to discuss other questions which have been presented in the briefs of the parties.

The judgment is reversed and the cause remanded with directions to the circuit court to enter judgment in favor of the appellant surety company discharging it from future liability under its bond and directing the co-curator and co-curatrix forthwith to furnish a new bond in the probate court, and ordering that when said new bond shall be approved and filed in the probate court the appellant stand discharged as surety on the bond involved herein and from all liability arising from any subsequent misconduct or default of the principals in said bond, and that appellant shall thenceforth be liable on said bond herein only for such breaches thereof as shall have happened prior to the taking, approving, and filing of the new bond in the probate court; and it is further directed that the circuit court, upon entering said judgment, shall certify a copy thereof to the probate court. *Hughes, P. J.,* and *Anderson, J.,* concur.