W. R. CLARKSON, RESPONDENT, v. STANDARD BRASS MANUFACTURING COMPANY, A CORPORATION, APPELLANT.—170 S. W. (2d) 407.

Kansas City Court of Appeals. March 1, 1943.

*H. B. (Jack) Manard, Fisher & Fisher* and *Calvin & Kimbrell* for appellant.

1020

*Louis A. Laughlin* and *Samuel Feller* for respondent.

1022

BOYER, C.—This case was instituted, heard by the court, and treated by the parties as a proceeding in equity to require an accounting of sales made by defendant to customers alleged to have been procured by the plaintiff, and to recover judgment for the amount of commissions found to. be due the plaintiff on said sales pursuant to the terms and conditions of a written contract attached to the petition.

The petition alleged the corporate capacity of defendant, and for cause of action stated that plaintiff and defendant entered into a contract of employment in writing on or about the 4th day of July, 1935, whereby the defendant employed the plaintiff to solicit business for it in any territory outside of Kansas City; that the contract provided that any new business secured by defendant as a result of plaintiff's efforts that plaintiff should be paid a commission as compensation for his services the difference between the net price quoted by defendant to plaintiff and the net amount or price received by defendant as the result of such transaction, and that such commissions should be continued to be paid on repeat orders by the defendant to plaintiff so long as plaintiff should continue to use his efforts to retain such business; that as a result of plaintiff's efforts he secured new business for the defendant from eleven named companies; that plaintiff has no means of knowing accurately what the repeat orders from said parties have amounted to and defendant has failed and refused to advise plaintiff as to such repeat orders and has failed and refused to pay plaintiff the commissions to which he is entitled under the contract; and further alleges that there is due and owing plaintiff more than $600, but he is unable to state the exact amount without an accounting being made by the defendant as to such repeat orders; and that plaintiff has been willing and has offered to and has used his best efforts to retain such business for defendant. A complete accounting was demanded as to all business transacted with the parties named by plaintiff and judgment for the amount of commissions found to be due under the terms of the contract.

The answer admits that defendant is a corporation and that R. E. Normandie, vice-president of defendant, and plaintiff entered into a contract on July 9, 1935. Further answering the defendant alleges that plaintiff has been paid all sums due and owing him under said contract except the sum of $4.20, which has been duly tendered by defendant and refused by the plaintiff; that prior to and not later than August 8, 1939, plaintiff ceased, failed and refused to use his best efforts to retain such business as he had obtained under said contracts for defendant, and that he was not thereafter entitled to any commissions under said contract; and the answer denies that plaintiff has complied with and performed the terms and conditions of said contract by him to be complied with and performed; and denies generally other allegations of the petition. No reply is shown of record.

The judgment of the court found the issues in favor of plaintiff, and that plaintiff was entitled to an average commission of two per cent on the selling price of material sold by defendant, and awarded plaintiff a judgment in the total sum of $3093.88, which was the combined sum of amounts found to be due plaintiff on sales to the Whitaker Battery Supply Company in the amount of $2794.17, and the sum of $299.71, found to be due as unpaid commissions on sales to all other customers.

The defendant duly appealed, and contends for error because the evidence does not support the finding and judgment, and upon all the evidence the judgment and decree should have been for the defendant; that the court erred in finding that plaintiff was entitled to commissions of two per cent of the amount of sales to the Whitaker Battery Supply Company because the evidence does not support such finding, and that the evidence affirmatively shows that plaintiff has not complied with the terms and conditions of the contract; that the court erred in its finding that plaintiff was entitled to commission of two per cent on defendant's sales to other customers after August 31, 1939, because the evidence showed that the commissions on all sales made to said companies prior to August 31, 1939, had been paid in full; and that the evidence affirmatively showed that the contract was cancelled and terminated by notice given under date of August 8, 1939, and effective on the last day of the month.

The main controversy in the case arises over sales made by defendant to the Whitaker Battery Supply Company, hereafter referred to as Whitaker. Plaintiff admitted that all commissions due him from other sales were paid in full up to and including August 31, 1939. The only question in reference to the right to commissions on these other accounts after the cancellation of the contract will depend upon the effect of that cancellation hereafter considered. The contract in question was offered in evidence by the plaintiff and reads as follows:

"Kansas City, Missouri,
"July 9th, 1935.

"Mr. W. R. Clarkson,
"Kansas City, Missouri.
"Dear Sir:

"This letter will confirm verbal agreement between you and the Standard Brass Manufacturing Company, concerning solicitation of business for us, the conditions of which are as follows:

"You will be authorized to solicit orders for castings for the Standard Brass Manufacturing Company in any territory outside of Kansas City, exceptions may be made by mutual consent in writing.

"Any new business secured as a result of your efforts and accepted by us will be compensated in the following manner:

"On any inquiries received from persons or firms with whom you have communicated and solicited, we will quote you net price on castings, you in turn will add your selling expense and transportation charges when quoting F. O. B. destination. Your compensation will be the differential between the net price quoted you, and the net amount received as the result of the transaction.

"Th company will continue to pay you commissions on repeat orders as long as you continue to use your best efforts to retain such business.

"Commissions on all orders accepted by the Company, will be paid to you on the tenth of the month following shipment of the order.

"The expense of postage and stationery used in the solicitation of orders for us will be paid by the company.

"The signature to this letter by yourself and the Standard Brass Manufacturing Company constitutes a working agreement between us.

"Standard Brass Mfg. Co.
"By R. E. Normandie,
"Vice-President.

"ACCEPTED:
"By W. R. Clarkson,
"W. R. Clarkson."

Plaintiff testified that the defendant prepared the contract, but Mr. Normandie, called as a witness by plaintiff, explained that the contract was typed in the office of the company from a manuscript previously prepared by the plaintiff and this was not denied. According to plaintiff's testimony he had formerly been connected with a foundry at Independence, Missouri, until September, 1934; that he was acquainted with prospective buyers and users of foundry products and that Mr. Normandie for some period of time had sought to engage his services as a solicitor; that prior to the execution of the contract and in pursuance of negotiations with Mr. Normandie he had engaged in solicitation of business for the defendant by writing to concerns whom he knew were purchasers of castings with a view of securing their orders. In describing the process in which he solicited business and quoted prices, he said that the defendant in the first place quoted a price because he did not know what the customer might use and he would have to know what was going to be bought before he could give a quotation. When he ascertained what a customer desired to buy he would then obtain a quotation of the price demanded by the company and then decide what amount he would add to that price for a quotation to the prospective purchaser. In reference to this price and the action of the defendant, plaintiff said: "They would give me the quotation in the first place. In other words, before I could make any quotations the foundry had to give them to me because I didn't know what price they wanted to make. Then I would add on

my commission and freight, if it was involved, and make the quotation.''

In reference to the Whitaker account plaintiff said that he was acquainted with Mr. Stuver, the purchasing agent for Whitaker, and he appears to have had some contact with Mr. Stuver during the time of plaintiff's connection with the foundry at Independence. On July 18, 1935, plaintiff addressed letters to the Whitaker Company, in one of which he quoted prices per thousand on four different types of brass terminals. These letters were signed in the name of the defendant and also bore the name of plaintiff. These letters assured the Whitaker Company of the capacity and ability of the defendant to meet its requirements and emphasized the desirable features of defendant's patterns and equipment as the best obtainable and to produce a product that would compare with the best on the market. The letter also stated that the defendant had a very large output and employed a corps of moulders daily throughout the year, although he later testified that after these letters were written he called on the Whitaker Company several times, but defendant's foundry equipment wasn't ready to fill orders when he wrote his letters; that he finally took Mr. Normandie over there and introduced him to Mr. Stuver. After that visit the foundry got a call from the Whitaker Company ''for prices or samples or something and Mr. Normandie told me about it and we made an appointment to go over there together,'' but when he appeared at the foundry to keep the engagement Mr. Normandie told him that he had already been over there and secured an order. Plaintiff said that he informed the defendant several times during the course of the intervening years that he expected a commission on the Whitaker business. ''Q. Now did you notify Mr. Normandie either orally or in writing that you were going to insist on your commission on those sales? A. It was all verbal. Q. Did you at any time tell him that in writing? A. Yes, sir, I think so, long afterwards in 1939.'' Plaintiff also said that Mr. Normandie declined payment of such commission because it was considered Kansas City business. The foundry was located in Kansas City, Missouri.

Plaintiff offered in evidence a letter dated July 19, 1939, in which he requested payment of commissions due and also an accounting and settlement of commissions due on orders from Whitaker. In answer to this letter, under date of August 8, 1939, Mr. Normandie on behalf of defendant replied by sending a check to cover all commissions due on sales to companies other than Whitaker up to and including the month of July, 1939, and informer plaintiff that commissions on sales during August would be computed and a check would be mailed to him on or about September 10, which would constitute final settlement, and then said: ''You can readily understand that this arrangement has not proven satisfactory to us, and you will

please accept this letter as notice of cancellation of the contract. Regarding the Whitaker account, I am sure you fully understand the status of this acount. If you will recall, that matter was disposed of by mutual understanding in the beginning." Plaintiff replied to this letter the following day, acknowledging receipt of check and cancellation of the contract and added that he presumed it was understood that the cancellation pertained to the solicitation and compensation of any business that might come thereafter from new accounts and not those already established, and claimed that he would be entitled to commissions in the future on all established accounts just the same as in the past. In reference to the Whitaker account he stated in part: "While you stated you would pay me no commission on this business, I never expressed or implied that I consented to your action. Therefore, I claim commission on this account since it was opened in 1935 and on any future orders you may receive from them." On August 17, 1939, the defendant replied to plaintiff's letter of August 9, as follows: "We do not propose to pay commissions on any sales made subsequent to August 31, 1939." The letters were offered in evidence by plaintiff: Upon inquiry by the court: "Q. Did you quit soliciting business for them at that time? A. Yes, sir, that is, I was asked to quit soliciting after that. Q. You didn't solicit any new business after that? A. No." Upon inquiry as to what his commissions would amount to he testified that he made his own calculations and added them to the net price and would add such an amount as he thought would enable him to get the business, and that he judged that the commission would be around two per cent. The defendant did not undertake to regulate his commission. Plaintiff did not know the prices obtained by the defendant for castings furnished Whitaker. "Q. How much was this North Kansas City commission? A. Well, that is what we don't know. I have absolutely no knowledge. Q. You don't know what they sold them? A. I have no idea. Q. They gave you no figures? A. No, sir, they refused to do that you see from the beginning."

Mr. Normandie called as a witness by plaintiff produced a statement of net sales to the Whitaker Company from January, 1936, to December 22, 1941, showing a total of $139,708.93. The amount of such sales to September, 1939, was $105,644.77. There was also produced a statement showing a report of sales from August 31, 1939, to December 26, 1941, made to other companies that had been solicited by the plaintiff in a total amount of $14,985.74.

In reference to the visit of Mr. Normandie and the plaintiff to the Whitaker Company, Mr. Normandie testified that plaintiff did not take him to Whitaker, but that he took the plaintiff when driving to North Kansas City to see another concern on business, and that they stopped in to see Mr. Stuver; that he had known Mr. Stuver per-

sonally sixteen or seventeen years; that this visit was five or six months before any order was finally obtained from Whitaker by him. The reasons why the plaintiff could not obtain an order from Whitaker and did not quote the Whitaker Company any price on any material that it would buy, as explained by this witness and also by Mr. Stuver, was because Whitaker was not at all interested in buying terminals manufactured by defendant from its own plates, but that Whitaker insisted on having a heavier terminal to be manufactured from its own patterns and designs, and bought by weight instead of by number of articles. Plaintiff never requested defendant from a quotation other than that originally submitted which was for a standard make of terminals from defendant's own models, and plaintiff never requested a quotation of a price from defendant for terminals to be made from the models of Whitaker and never quoted Whitaker any price on any such terminals. When Mr. Normandie ascertained the situation he attempted to procure the business on a basis satisfactory to Whitaker, and after submitting samples of terminals made from Whitaker's models he finally obtained an order and made the first sale, as shown by his ledger account on January 2, 1936. It was explained by this witness that due to the competitive condition prevailing in this territory between his company and other foundaries, it was impossible for plaintiff to obtain an order at a price that would include a commission. After the order was obtained Mr. Normandie informed plaintiff as to what had transpired and explained to him at the time that no commission could be allowed on that business, and that plaintiff never made any request or demand for a commission on the Whitaker business until their relations had become unsatisfactory on account of plaintiff's failure to report at the office of the foundry as he had done formerly and assist in reference to the inquiries and orders coming in from other customers who had been solicited by the plaintiff.

Upon inquiry by the court as to what was said between the parties in reference to commission on the Whitaker account, the witness stated: "When I secured this order from the Whitaker people on their patterns, I think I mentioned something about it to Mr. Clarkson when he was riding home in my car at that time, and he asked me if I figured on a commission and I said, 'No, I haven't, Clarkson. We have gone over that before and on account of the competition we have here we couldn't secure the account with commission added to the selling price of the work.'"

In the beginning of the relationship, after the contract was signed, plaintiff was furnished the use of a desk, typewriter, filing cabinet, stationery and postage in the office of defendant where he would appear on three or four different days of the week, attend to correspondence and co-operate with defendant in attempting to procure business and to answer the inquiries of customers. In the course of time

plaintiff ceased his attention to business at the office and during the last year he was not in the office more than once or twice during the whole period. Plaintiff claimed that he conducted his work from his home of evenings and that he was otherwise engaged, but admitted that he did occasionally visit the office and answer correspondence; and complained that the defendant did not keep him informed of correspondence or orders received. According to Mr. Normandie, plaintiff was notified whenever he was accessible, but "in 1939 the man wasn't in the place but two or three times. He quit coming around." In his absence defendant took care of correspondence, wrote in answer to inquiries, and paid plaintiff's commission until the time the contract was cancelled.

Plaintiff also called Mr. Stuver, the purchasing agent for Whitaker, who testified that Whitaker was operating in North Kansas City and had been there since 1929; that plaintiff came to see him but he did not remember the date; he knew of plaintiff's previous connection with one of Whitaker's competitors; he did not remember receiving letters from plaintiff; that he was acquainted with Mr. Normandie and had known him before 1929; that plaintiff and Normandie came to see him together on one occasion and plaintiff had been to see him before; they talked about business but he did not give them any. He was asked when Mr. Normandie came back and replied: "I haven't any idea, but it was quite a lot of time. I wouldn't remember it at all except I know—I practically dismissed it from my mind." According to his ledger sheet the first purchase made from defendant was shown by an invoice of January 2, 1936; plaintiff did not get him interested in the defendant's line of products but had talked to him several times and wrote him letters; "I didn't follow up on it. If I had been a salesman I would have followed it, but I was on the purchasing end and it was out as far as I was concerned and I paid no attention." He testified that the articles all "had to be made off of our patterns," and when asked what induced him to give the first order said: "Because the price was in line and the samples from our plates were satisfactory;" he bought none of the regular stock made by defendant; it was all made "off of our patterns." On cross-examination he further stated that during all the time that he dealt with the defendant he also got prices from its competitors, and that if defendant's prices were out of line with competition in Kansas City, it wouldn't get the business; that all orders obtained by defendant were given in view of a competitive situation and defendant won out over its competitiors based on price and quality; that he never gave an order to plaintiff for the defendant.

Plaintiff was recalled and was permitted to testify to certain conversations and incidents prior to the execution of the contract and the inducements therefor, and over objection was permitted to testify as to what his average commission would be on quotations made by

him for about a year and a half, and "they ran somewhat over two per cent on an average." He was asked how he did his work for defendant and stated: "I did all my work at home. I was employed by another company, so, of course, I had no time to put on it in daytime. I had to do my work of evenings at home and Sundays and such time as I had outside of my regular work hours." Defendant bought a business directory for his use; that the orders for goods all went to the defendant company; he denied that he had a desk in defendant's place of business or kept his correspondence there, but said: "Occasionally if I would happen to be out there in the evening and there was a reply or something they would tell me about I would write it before I would leave and that is all." On cross-examination he said for the first few months after the contract was signed he was not at defendant's place of business "very much;" I might have come up one or two evenings a week and sometimes they brought the communications to me;" he wrote all letters in the company's name and the answers would come back to the company; occasionally he would write a letter from the company's office but very seldom; he solicited inquiries but he did not quote prices unless he had quotations from the foundry; that he never quoted Whitaker prices except once or twice when he first started over there; that he never went back to see Whitaker after he and Normandie were over there; that Normandie took up the work but it was not agreeable to him, and he still insisted that he introduced Mr. Normandie and Mr. Stuver although they had been personally acquainted for many years. "Q. You say you never went around Whitaker any more after that? A. I was over there at a later date on another matter, but not on soliciting business for the Standard Brass Manufacturing Company. Q. Now as a matter of fact, Mr. Clarkson, you really abandoned your pursuit of Whitaker in October, 1935? A. After Mr. Normandie took it away from me." He continued to quote prices to other customers but never made similar quotations to Whitaker after that time. "No, sir, I couldn't quote them. Those are the matters that Mr. Stuver said they don't buy." He testified further in reference to conversations between himself and Mr. Normandie about commissions on the Whitaker account after the first order had been obtained, and that he informed Mr. Normandie then he expected a commission on the business and Normandie replied: "Well, I won't pay it because that is one I am going to look after myself;" that was in the latter part of 1935.

Mr. Normandie further explained the necessity of making new quotations on each order that would come in from defendant's customers on account of the violent fluctuation of the metal market, and when such orders would arrive it was necessary to communicate with plaintiff and ascertain the amount of commission he desired to attach to the price quoted him in order to quote a price to the customer.

1030

Business with plaintiff's customers declined in amount during the last year or two as shown by the statement of commissions due and paid.

The length of this statement is due to an effort to make it sufficiently comprehensive to include the substance of all the evidence, and particularly that part which appears to be emphasized in the briefs and arguments of the respective parties.

Treating the case as of the character given it by the court and the parties and as one to be determined here *de novo,* the conclusion has been reached that upon the whole record the plaintiff has no standing in equity and was not entitled to the judgment awarded. Equity follows the law. Plaintiff's claim is based upon a special contract. Compensation as provided therein is conditional and contingent. Definite procedure is prescribed and particular things are to be done before any compensation is earned. Plaintiff was authorized to solicit orders but any new business upon which plaintiff would be entitled to compensation was required to be obtained in the process prescribed. That is, the inquiry of the customer for specified castings or material would reach the defendant as a result of plaintiff's efforts. The defendant would then quote the plaintiff a net price and plaintiff would add, at his own option, such an amount as he thought permissible and the quotation would then be made to the customer at the price fixed by plaintiff. If the customer decided to buy at said quoted price and the defendant accepted the order, made the sale, and collected the total amount, it would then owe plaintiff the amount which was added by him to the net price quoted by defendant. There is no evidence that this process was followed in reference to the Whitaker business. Plaintiff was at least required to show that he requested quotations from the defendant as to its net cost for manufacturing castings purchased by Whitaker, that the defendant quoted such prices, that his compensation was added to that quoted price, that the combined price was then quoted to Whitaker and that Whitaker gave defendant its order at the combined price, that defendant accepted it, sold the product, and collected the full amount of the combined price. There is no evidence that plaintiff ever quoted Whitaker prices on anything that Whitaker would buy, and there is no evidence that the defendant sold Whitaker any terminals or castings at a combined price and collected thereon any money that would be due the plaintiff. The weight of the evidence, documentary and otherwise, is that plaintiff was unable to obtain any business for defendant from Whitaker according to the terms of his ''working agreement,'' and did not so obtain it. None of his proposals interested Mr. Stuver, the purchasing agent for Whitaker, and in Stuver's language ''it was out as far as I was concerned and I paid no attention.'' That was his attitude after the joint visit of Mr. Normandie and the plaintiff to see him. Several months afterwards the defendant, through

Mr. Normandie, was finally successful in negotiating a contract with Whitaker containing special requirements that castings were to be made from Whitaker's own patterns and designs and of heavier weight than the ones regularly made by defendant, and they were to be furnished and sold by weight, and at a price acceptable to Whitaker when compared with the prices of defendant's competitors. No invasion of plaintiff's rights is apparent from this transaction. Plaintiff's authority to solicit business was not exclusive, and if plaintiff could not secure business at a particular place or from a particular company, under the terms of the contract, there was no obligation on the part of defendant to refrain from its own solicitation in the same territory or even from the same parties whom plaintiff had unsuccessfully solicited. There is no claim of fraud in the conduct of defendant as the basis of this action.

From the testimony of plaintiff and that of Mr. Normandie and Mr. Stuver, whom plaintiff called as his witnesses, the most reasonable inference is that plaintiff was fully aware that he could not obtain the Whitaker business at a price including a commission on account of prevailing competitive conditions, abandoned effort to do so, and that he never claimed a commission on the business obtained by Mr. Normandie for a number of years, and after strained relationship arose.

Respondent relies upon the general rule that an agent earns his commission when he brings the parties together and shows that he was the procuring cause of a sale later made by the owner. Such rule is generally recognized where the agent's authority is not limited or conditioned; but "where a special contract exists, in order to entitle the broker to recover, he must show that he has fully complied with the terms and conditions thereof, for otherwise he has not completed his undertaking and has earned no commission." [Westerman v. Peer Investment Co., 197 Mo. App. 278, 284, 195 S. W. 78, and cases cited.] "Owners and their brokers, like others, may by their expressed contract condition liability upon prescribed events, contingencies or conditions precedent." [Tant v. Gee, 154 S. W. (2d) 745, 747, 348 Mo. 633.]. "It is elementary law that, when a contract is made upon a certain named condition, a party seeking to recover under such contract must bring himself within such condition. This rule of law applies to a broker's contracts as well as to others." [Hughes & Thurman v. Dodd, 164 Mo. App. 454, 459, 146 S. W. 446, l. c. 447.] All contingencies upon which the agent's compensation is dependent must be met before the agent is entitled to compensation. [3 C. J. S., p. 69, sec. 178.]

The claim of respondent's counsel that plaintiff was entitled to recover for commissions on sales made to the Whitaker Company because plaintiff was the procuring cause in securing said company as a customer for defendant cannot be sustained, and the authorities cited by respondent on that proposition are not applicable in this case be-

cause plaintiff, under the evidence, was not the procuring cause; and for the further reason that plaintiff's right to commissions was conditioned by the contract relied upon, and there was no evidence to show that such conditions were met. The further claim in behalf of respondent that all facts necessary for plaintiff to recover were admitted by defendant, and inasmuch as the trial court found the issues in favor of plaintiff this court would defer largely to such findings on conflicting testimony, is not appropriate here because all necessary facts to show plaintiff's right of recovery were not established, and plaintiff's rights are not determinable upon conflicting oral testimony. His rights depend primarily upon the legal effect of his special contract and proof of compliance with its prescribed conditions. The judgment of the court awarding commissions for sales made to Whitaker is not supported by the evidence for the reasons above set forth, and the judgment in that respect is not approved.

The court allowed plaintiff an additional sum as commissions on sales made by defendant to other customers subsequent to the cancellation of the contract. Respondent claims the right to commissions on all sales made by defendant to customers originally secured by plaintiff after the cancellation of the contract and for all time in the future whether the cancellation was lawful or otherwise.

The writing between the parties, referred to as a contract, was in the first place merely unilateral in character, conveying a power or authority and a promise of payment for something to be done as therein provided. It became bilateral only to the extent that its conditions were met. There was no provision for its period of duration. A contract will not be construed to impose an obligation in perpetuity unless the unequivocal language of such contract compels such construction, and when executed for an indefinite period, and by its nature it is not deemed to be perpetual, it may be terminated at will upon reasonable notice. [17 C. J. S., p. 887, sec. 398; Paisley v. Lucas, 346 Mo. 827, 843, 143 S. W. (2d) 262, 271; Massachusetts Bonding & Ins. Co. v. Simonds-Shields-Lonsdale Grain Co., 226 Mo. App. 1071, 1078, 49 S. W. (2d) 645.] An agency to sell personalty or realty on commission is not such an interest as renders the agency irrevocable. [2 American Jurisprudence, secs. 78, 84.] The contract imposed no obligation in perpetuity, and it is abundantly clear that defendant could exercise the right of cancellation at will and revoke all power and authority with which plaintiff was vested by its terms. Defendant gave notice of its intended cancellation and the termination of its effect as of August 31, 1939, and sent plaintiff a check as payment in full up to that time. Plaintiff admits that he received all commissions that he claims due to that date, but avows his readiness to continue to use his efforts to retain these customers' business, provided the defendant would keep him informed, and as-

serts the right to commissions as long as defendant may continue to transact business with certain specified companies for all time to come.

Plaintiff could have no right to compensation without the rendition of service. After the cancellation of the contract his employment ceased. Furthermore, the opinion is entertained from the whole record in this case that defendant not only had the right of cancellation at will, and duly exercised it, but also had the right of cancellation for cause. Plaintiff's obligations to defendant to use his best efforts to retain business were not fulfilled, as evidence by his own testimony. He absented himself from defendant's place of business, rendered himself inaccessible for necessary conferences, and engaged in other business that occupied all of his daytime work. To sustain plaintiff's claim for commissions subsequent to cancellation of the contract, and indefinitely, without the rendition of any service, would be a shocking and manifest injustice to defendant. A demand of something for nothing is reduced to dross in the flame of conscience and equity closes the door in its face.

But respondent contends that the defense of cancellation or abandonment of the contract cannot be made by defendant because such defense was not pleaded. The rule that affirmative defenses to be available must be pleaded is recognized, but it does not apply when plaintiff's evidence develops the facts upon which the defense is based, and shows that plaintiff has no right to recover. In this case plaintiff introduced the letters and furnished proof that established revocation of his authority, and further testified that he was asked to quit soliciting business after that time and that he did so.

The findings and conclusions heretofore reached are sufficient to dispose of the case and render unnecessary any further consideration of respondent's brief and argument. The result is that the judgment should be reversed and the case remanded with direction to enter judgment for defendant. The Commissioner so recommends. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is reversed and the case remanded with direction to enter judgment for defendant. All concur.