261 S.W.2d 651 (1953)
WITTE
v.
COOKE TRACTOR CO.
No. 28421.
St. Louis Court of Appeals. Missouri.
October 20, 1953.
Rehearing Denied November 13, 1953.
*653 Edward C. Schneider and Harry A. Frank, St. Louis, for appellant.
Jesse E. Bishop, St. Louis, for respondent.
HOUSER, Commissioner.
This is an action in equity to rescind a contract for the purchase of a movable crane, for cancellation of the note and mortgage given in part payment therefor, and for refund of installments paid thereon, based upon breach of warranty.
Frank L. Witte, an excavating material and hauling contractor, sued Cooke Tractor Company, a corporate distributor and dealer in excavating equipment and machinery, alleging in his petition that plaintiff consulted with defendant regarding the purchase of suitable equipment for use in excavating work and explained the use to be made of the equipment; that defendant advised plaintiff to purchase a Wayne Crane and attachments and "represented to plaintiff that such equipment would adequately do the work for which it was intended: excavation of earth on various contracting jobs." The petition further alleged the purchase of the equipment, the giving of a promissory note and chattel mortgage thereon for the unpaid purchase price, the payment of $5,916.32 on the note; that a balance of $11,968.60 is due on the note; that the equipment did not and could not adequately do the work for which it was purchased but continually broke down, requiring repairs, replacements and rebuilding, causing plaintiff loss of time, damage and expense; that defendant was notified of the failure of the equipment and although defendant attempted to make repairs the equipment has never operated in a reasonable and satisfactory manner and has not been able to do the work which was in the contemplation of the parties at the time the equipment was purchased; and that plaintiff formally rescinded, and offered to return the equipment. Plaintiff sought an injunction to restrain defendant from repossessing *654 the equipment, and prayed for rescission of the contract of purchase, cancellation of the note and mortgage and asked judgment for $5,916.32.
Defendant filed a general denial. The parties entered into a stipulation whereby plaintiff turned over the equipment to defendant and defendant delivered the note and mortgage to plaintiff for cancellation, plaintiff to have no further liability thereon, with the provision that the stipulation should not prejudice or affect the rights or liabilities of the parties respecting the matter in controversy except that if the court should order rescission of the contract then plaintiff should be under no obligation to return the equipment and no order of cancellation of the mortgage and note should be necessary. The trial chancellor after hearing all of the evidence found the issues for plaintiff and against defendant and awarded plaintiff, the purchaser, the sum of $5,916.32. From that decree the Cooke Tractor Company has appealed to this court.
Plaintiff informed Ernest Cooke, defendant's manager, and John Wilsdon, defendant's salesman, that he was in the wrecking and excavating business, and was in the market to buy a machine; that he needed equipment that would really go out and do the type of work necessary; that in his type of work with competition, etc. he always figured a capacity of around 600 cubic yards a day on a ½ yard crane; that he needed a machine that would dig from 560 to 600 yards a day, which in terms of truckloads would be from 125 to 150 truckloads, working on an 8-hour schedule. Plaintiff spoke to Wilsdon several times about his particular needs and uses for a crane and impressed upon him that he needed a crane capable of doing "a lot of excavating work." Wilsdon recommended the Wayne crane. He was told that plaintiff was doing all kinds of excavating and cleaning up work as well as digging basements. Wilsdon was out on several jobs plaintiff was working on and saw the operations. While plaintiff had previously had experience with Lima, Bay State and North-West Cranes, plaintiff informed Wilsdon that he knew nothing about a Wayne Crane and had never seen one of them. Wilsdon prevailed on plaintiff to go to defendant's place of business to look at the crane. Wilsdon told plaintiff that the Wayne Crane was "faster than anything on the market, and that it would outdig and outperform any machine that was in use in and around St. Louis. * * *." Cooke informed plaintiff that "this Wayne Crane was tops with any one of them, this equipment, that it would outdig any other crane, so far as speed was concerned * * that it would outdig any machine, that it would dig 150 loads or better a day * * * that it would outperform any 1/2 yard machine that was on the market * * * that it had the speed and it had the stability to outperform any machine on the market," and that it had all the qualifications needed to do the work and was faster and better and easier to handle than anything plaintiff had been using; that it would "run rings around" anything else on the market. Defendant company supplied Wilsdon with literature concerning the crane and instructed him to use the literature as the basis of fact in dealing with prospective purchasers and that the representations in the literature were to be passed on to the prospects as facts. Typical statements concerning the Wayne Crane appearing in the descriptive literature follow: "Does more jobs easier, faster; digs rapidly; moves more dirt per hour; dumps cleaner; lower cost per yard; does basement excavation faster; does more work; saves time; moves dirt quicker because of its speed and ease of operation; more speed; more mobility; keeps trucks rolling; saves man hours, demurrage and gets things done; Wayne Crane efficiency does it better; greater mobility that means more work in less time; moves more material." Wilsdon made two or three trips thereafter to plaintiff's office. Plaintiff expressed the desire to see a Wayne Crane in operation, and Wilsdon took him to East St. Louis to see one, but it was idle at the time they arrived. He conceded that he "didn't just buy the equipment right off the bat" but "spent some time in reviewing it over" in his own mind over a period of ten days or *655 two weeks. He stated, however, that one could not determine, by looking at the crane, whether it was too light in weight for his particular purpose; that it would be necessary to put the machine in actual operation before you could tell whether it was adapted to your purposes. Wilsdon at last told plaintiff that Cooke had stated what the machine would do and that "Mr. Cooke would stand on it in every shape and form and back it up." It was then, on August 22, 1947, that plaintiff bought the crane. He used the machine and equipment on 55 separate jobs on 133 different days, during which the machine was actually in use 972 work hours. On June 25, 1948 plaintiff's attorney wrote defendant rescinding the contract of sale and offering to return the crane and equipment.
There was voluminous evidence indicating that the crane and equipment did not satisfactorily perform the work for which it was intended. Plaintiff had trouble with the hydraulic cylinder, the friction brake bands, the clutch, the teeth on the shovel, the shovel stick cable, oil leaks, the steering apparatus, the generator bracket, the pump, and the boom hoist lever. It would heat up when run normally. There were numerous breakdowns, frequent necessity for repairs, failure to get production with the crane, failure of the crane to perform properly, failure to pick up full shovels of earth, failure to hold cinders in the bucket. The number of loads per day ran far short of normal. The shovel would pick up only half or quarter bucket loads at a time. It was slow in operation, slow in the hoist. One operator said that for shoveling and hard digging it was "not so hot." Another said that it could not be used as a shovel; that "it wouldn't do the digging; we couldn't load with it." A job that should take six or eight hours would require two days to finish. Many hours and days were lost while the machine was being repaired. It was necessary to rent other cranes in order to complete jobs undertaken with the equipment. The best production plaintiff ever experienced with the crane was 100 truckloads in eight hours, under ideal conditions. On some days they got as few as eight loads in eight hours. Other half yard cranes will dig and load from 400 to 600 cubic yards (110 to 125 truckloads) in an average day's work of eight hours. Operators would become disgusted on account of the necessary repairs and would quit. The machine, when used as a shovel, would not stay in position but would push itself backwards, i. e. instead of the bucket going up when the power was applied, the machine would slide back away from the embankment. If the machine was stabilized to prevent it from moving backwards, it would bend the shovel stick. The machine was not built strong enough, and was unable to lift enough, or to "take the beating they would have to take under the conditions of excavating." The shovel attachment never did work successfully.
Defendant's witnesses denied the making of the oral representations, denied any complaints on the part of plaintiff until April 16, 1948, denied that defendant had urged plaintiff to keep the machine and have it repaired and that it would eventually perform satisfactorily, and contended that the Wayne is a very good crane which compares favorably with other half yard cranes on the market.
During the course of the trial the purchase order signed by plaintiff, which contained a statement "It is understood that the machinery is sold by the dealer with the standard warranty of the manufacturer. This is the only warranty either expressed, implied or statutory, upon which the machinery is sold," (Defendant's Exhibit No. 1) was identified by plaintiff, Cooke and Wilsdon. Defendant offered the exhibit during plaintiff's case. It was not admitted then and was reoffered by defendant at the close of plaintiff's case but the court ruled it out. The standard warranty of the manufacturer was as follows: "The equipment to be free from defects in material and workmanship under normal use and service."
On this appeal defendant contends that there was no express warranty. It is argued that the statements that the Wayne Crane was "faster" and would "outdig and *656 outperform any other machine" constitute mere "dealers' talk" and "puffing" which cannot be construed as warranties and that plaintiff did not sustain the burden of proving the statement that the Wayne Crane would "dig and load 150 truckloads or better a day." Plaintiff takes the position that there was both an express warranty that the machine would load 100 to 150 trucks per day and that it was faster and would outdig and outperform any other machine of its class, and an implied warranty that it was reasonably fit for use as a shovel crane. Defendant counters that there can be no implied warranty in this case because this is a case of express warranty, if anything, and that an express warranty excludes an implied warranty.
The sufficiency of the petition to allege an express warranty has not been challenged, indeed, defendant concedes that "the plaintiff's petition pleads an oral express warranty." While not a classic example of the pleader's art, the petition, not having been attacked by motion in the pleading stage, is sufficient after judgment as the statement of a claim upon which relief could be granted on the theory of express warranty. If, therefore, the proof was sufficient to sustain an oral express warranty, we need not determine whether this is also a case of implied warranty.
We have concluded that plaintiff's evidence makes out a case of oral express warranty that the crane would load 150 truckloads or better per day authorizing recovery under the general allegations of express warranty contained in the petition. A statement that a machine is of a certain capacity may constitute a warranty to that effect. 77 C. J. S., Sales, § 330(2), page 1194; Cosgrove v. Bennett, 32 Minn. 371, 20 N.W. 359, where the contract provided that a roller machine have "`capacity of one hundred barrels per twenty-four hours'"; Chamberlain Co. v. Allis-Chalmers Mfg. Co., 51 Cal.App.2d 520, 125 P.2d 113, where the representation was that a pumice sifter would grade two tons per hour of dry pumice at 98½% efficiency; Sauerman & Ball v. Simmons, 74 Ark. 563, 86 S.W. 429, where the statement was made that a pump would lift water 35 feet on a straight lift. The statement that the crane would dig and load 150 truckloads or better a day was a positive affirmation or representation of a fact and not a mere expression of opinion, and meant that the crane was capable of loading the stipulated number of trucks in an ordinary 8-hour day, when properly used and handled. See Tower v. Pauley, 76 Mo.App. 287; Cosgrove v. Bennett, supra. Plaintiff used crane operators whose experience ranged from 17 to 37 years, and who were shown to be careful and efficient. Even under the most favorable circumstances the machine was not capable of loading more than 100 truckloads per day. The average production was considerably less. That the machine utterly failed to measure up to the express warranty was proved by overwhelming evidence.
For its next point defendant claims that plaintiff did not sustain the burden of proving the express representation that the Wayne Crane would load 150 truckloads or better a day, pointing to the fact that the statement was asserted only by plaintiff, whereas it was denied by three of defendant's witnesses, including the president of the company. We have considered and weighed the evidence on both sides of this issue and conclude that the express warranty was made.
Defendant asserts, however, that plaintiff's failure to rescind and tender back the crane within a reasonable length of time bars rescission of the contract. It is true that one who seeks to rescind a sales contract must do so within a reasonable time after the discovery of the grounds for rescission. Stone v. Kies, Mo. App., 227 S.W.2d 85. In the case at bar plaintiff discovered that the crane was not suitable or adaptable for his uses and purposes within about sixty days after the date of purchase. The contract was not rescinded and the crane tendered back until some eight months after the discovery and approximately ten months after the purchase was made. We find, however, that *657 defendant's agents caused the delay by persistently requesting plaintiff to keep the crane and repeatedly assuring plaintiff that the deficiencies in the crane were but temporary, that the defects would be corrected and the weak parts of the machine replaced, and constantly and on numerous occasions urging plaintiff to continue using and operating the crane. When plaintiff discovered that the crane was not suitable he offered to return it to defendant. Had defendant accepted it at that time there would have been no delay. Every time plaintiff expressed dissatisfaction or offered to return the crane, however, he was promptly assured by Cooke that the crane would operate satisfactorily on continued use; that he was just having a streak of bad luck; that it would work out all right; that plaintiff should keep on using it; that the longer he used it the better it would work; that he would get the weak parts of the machine replaced and that after continuing to use it for a while the defects would be removed. During this period of many months defendant had the crane in its shop on numerous occasions for the purpose of repairing the same and rebuilding it in an effort to satisfy the demands of plaintiff, and repeatedly assured plaintiff that they would eventually "get the bugs out" of the machine and that it would properly perform. Defendant contends, however, that after April 23, 1948 it did not urge plaintiff to retain and continue to use the equipment; that from that time defendant was demanding payment of the note and threatening to replevy the crane if plaintiff did not pay, which is inconsistent with the idea of continued use of the machine. As early as January, 1948 defendant was requested to take the machine back and refund the money paid by plaintiff. Cooke told plaintiff to continue using it; that the spring of the year was coming and that things would "work out all right." Reassured by Cooke, plaintiff continued to operate it, and make payments on the note. Plaintiff made his fourth installment payment of $664 on January 10. The fifth and sixth payments were made on March 17 and April 2. On April 2 plaintiff told Cooke that he refused to make any further payments because of unsatisfactory operation of the machine. While it is true that during that conversation Cooke told plaintiff that if the payments were not made he would repossess the crane, it is also true that thereafter complaints were made and defendant responded by making further efforts to satisfy plaintiff, and that after these later repairs were made Cooke told plaintiff that they had installed heavier gears and shafts and that the crane would go out and perform the work. On April 16 plaintiff made complaint about the boom hoist shift. On April 17 an operator left after operating the machine for only 3 days, and on April 19 plaintiff spoke to Cooke about his intention not to use the machine any longer. Cooke talked plaintiff into continued use of the machine; told him that they "had all of the bugs out of it by then." On April 23 plaintiff complained about the spider drum. Invoices dated April 20, 21 and 27 were issued by defendant to plaintiff for labor and parts. The crane either broke down or gave trouble requiring repairs on May 6, 7, 10, 11, 14, 21, 24 and June 7 and 15, 1948; "they" put the machine back in running order, changed the bands and worked on it, on these occasions, and after each repair job plaintiff put the machine back to work. It was also in evidence that plaintiff made complaint to Cooke about the operation of the crane from two to four times a month during the period of time he had the crane. Finally in June, 1948 plaintiff went to defendant's office and told Cooke that he had tried his best to use the machine and put it on jobs where he could "make something with it" but that he was unable to do so because the machine was "no good"; that he could not make any money with the machine or continue to make payments; that he was not going to use the crane again and wanted Cooke to take it back.
In Aeolian Co. of Missouri v. Boyd, Mo. App., 65 S.W.2d 111, we said, loc. cit. 114:
"The rule that a purchaser must rescind promptly upon discovering the misrepresentations of the seller does not apply where the delay in rescission is occasioned by the action of the seller in requesting and inducing the *658 purchaser to continue to try to use the article pending replacements or adjustments. (Citing cases.)"
And see McCartney v. Taylor Aircraft Co., Mo.App., 140 S.W.2d 95, loc. cit. 98, where the court said with respect to the purchaser of a defective airplane:
"* * * his action in not rescinding promptly will not constitute a waiver of his right to thereafter rely upon a rescission, where the seller, either expressly or by implication from his acts and conduct, induces the purchaser to continue to use the property pending a correction of the defects. In this situation the seller cannot invoke the rule that the purchaser has waived his right to rely upon a rescission."
In Dubinsky v. Lindburg Cadillac Co., Mo. App., 250 S.W.2d 830, loc. cit. 832, we said:
"If the purchaser is persuaded by the seller to keep the automobile for a while to give it proper trial or to permit the seller to correct the defect and it is not made to come up to the warranty he may still return the same and recover the purchase price."
See also 77 A.L.R. loc. cit. 1186.
On the evidence in this case we cannot convict the trial court of error in failing to hold that rescission was barred. We do not believe that plaintiff at any time accepted the crane in its then condition as in compliance with the contract. See Goodwin Mfg. Co. v. Arthur Fritsch Foundry & Machine Co., 115 Mo.App. 382, loc. cit. 389, 89 S.W. 911.
It is next urged that the court erred in refusing to admit in evidence Defendant's Exhibit No. 1, the written purchase order signed by plaintiff, which contained a provision limiting the liability of the dealer to the standard warranty of the manufacturer, and which would have excluded all other warranties, express or implied. Plaintiff's principal objection to the offer of the exhibit was that defendant should have pleaded the written warranty as an affirmative defense. We are obliged to sustain the ruling of the trial court in this connection for the reason that Section 509.090 RSMo 1949, V.A.M.S., provides that "In pleading to a preceding pleading, a party shall set forth affirmatively * * * any * * * matter constituting an avoidance or affirmative defense. * * *" Defendant failed to affirmatively plead this matter as an avoidance or affirmative defense, contenting itself with the filing of a general denial. In an action based upon breach of implied warranty of fitness and upon an express oral warranty that a machine was capable of a certain performance, the defense that the parties expressly limited the extent of the warranty by an agreement in writing is special and affirmative, and must be pleaded if it is to be relied upon. Defendant would circumvent this rule on the ground that plaintiff's evidence developed the facts upon which the defense is based. While we recognize an exception to the rule in such case, see Clarkson v. Standard Brass Mfg. Co., 237 Mo.App. 1018, 170 S.W.2d 407 and Warren v. Royal Exchange Assur. Co., Mo.App., 205 S.W.2d 744, the facts in the instant case do not come within the exception. The evidence was not developed, introduced, or relied upon by plaintiff. On the contrary, plaintiff strenuously objected to its introduction into the case. The exhibit was Defendant's Exhibit 1. Defendant, on cross-examination, brought it to the attention of plaintiff and had him identify his signature thereon, Defendant offered it in evidence.
Defendant claims that since an offer was made to prove the purchase order and the terms of the manufacturer's warranty, that evidence is now before this court and should be considered in the review of this case. An appellate court, however, reviews the case on the record made in the trial court, and can consider only the evidence which was admissible under the pleadings as they were made up in the trial court. The evidence not having been admissible for the trial court's consideration, under the pleadings, it is not permissible for us to consider it.
*659 Defendant also contends that the offer to return the crane was qualified (i. e. conditioned upon the return of the purchase price) and that such a tender was insufficient to constitute a rescission of the contract; that an unqualified tender is a necessary prerequisite to an action at law for the recovery of the purchase price. True enough, there is no foundation for an action at law unless a rescission has been effected as a fait accompli. Such an action is based upon rescission, and in order to be maintained there must be a showing that before the action was instituted plaintiff "tendered back what he received under the contract." Dahler v. Meistrell, 224 Mo. App. 815, 24 S.W.2d 238, loc. cit. 242. The instant action, however, was not filed as an action at law based upon a rescission of the contract by plaintiff as an accomplished fact. This suit was filed as a suit in equity in which the aid of the court was invoked to secure a rescission of the contract. In such case an actual tender is not necessary, it being sufficient for plaintiff to plead a willingness to tender into court what was received under the contract. Dahler v. Meistrell, supra. After the suit was filed the parties entered into a stipulation and agreement by which the crane was returned to the seller and the note and mortgage, duly cancelled, were returned to the buyer. The suit proceeded to trial on the question of whether a rescission should be declared by the court. The exchange of the crane for the papers was not to prejudice the rights or liabilities of the parties and the only question at issue which remained was the question whether the seller was obliged to return to the purchaser the amount he had paid on the note. The qualified tender was sufficient for the maintenance of an equity suit. That which occurred, by agreement of the parties, after the filing of that suit did not relate back so as to require a different type of tender.
Nothwithstanding that a breach of the warranty was plainly shown, it was elicited on cross-examination of plaintiff that the machine actually operated on 133 different days for a total of 972 out of a a possible 1,064 working hours and that plaintiff had considerable income from its use and operation. Can a purchaser of goods have rescission and restitution of that part of the purchase price which he has paid where the goods are not totally and entirely unfit and worthless? The rule is that there may not be a rescission for a partial failure of consideration unless it is substantial and material, 77 C.J.S., Sales, § 97, page 788; 78 C.J.S., Sales, § 491, page 159, or, as stated by Corbin on Contracts, Vol. 5, § 1119, when the contract has been broken by the seller in a manner so substantial that the buyer may rightfully return the goods after having accepted them, and regard the breach as "total". This involves "weighing the breach" to determine whether it is substantial or comparatively immaterial, "by determining the extent of harm caused by it to the buyer and the degree to which it frustrates his purpose in buying * * *." In the case at bar the crane was substantially and materially unfit to do the work and accomplish the purpose for which it was warranted and purchased, and the fact that it was not wholly worthless or totally unfit does not prevent rescission.
It is also urged that plaintiff has sustained no loss; that he enjoyed the valuable use of the crane and that the purchase price paid should be "offset" by the amount of the value of such use, which defendant asserts was approximately $10,000. Wholly aside from the question of the right to assert a setoff or recoupment of this nature, which we do not now determine, there could be no such allowance in any event in this case because defendant did not file any pleading in which it sought an allowance for the rental value of the crane or for the value of its use. Defendant filed nothing but a general denial and cannot now claim the right to setoff or recoupment in the nature of a counterclaim. In order to do so it must have been pleaded under the compulsory counterclaim statute, Section 509.420 RSMo 1949, V.A.M.S. Defendant quotes from 78 C.J.S., Sales, § 513, page 185, as follows: "Buyer's recovery of the price paid will be offset by the value of the buyer's use of the goods before rescission". *660 None of the cases cited in support of this statement arose in this jurisdiction, and an examination of them reveals that the question of the value of the use of the subject of the sale in each instance was made an issue by the pleadings. It is true that there was some desultory evidence in the case at bar adduced by defendant during the cross-examination of plaintiff, concerning certain amounts paid to the latter for the use of the crane on a few jobs, and some evidence as to the cost of operation of the crane. It cannot in fairness be said, however, that the parties broadened the issues and tried the issue of the value of the use of the crane, either by express or implied consent, under Section 509.500 RS Mo 1949, V.A.M.S. Nor can we set off the value of the use on the theory that in granting relief to a plaintiff a court of equity, in its discretion, may impose just and proper conditions and require plaintiff to allow defendant his equitable rights. "The powers of a court of equity are broad, but they are limited to the cause of action and issues made by the pleadings." Branner v. Klaber, 330 Mo. 306, 49 S.W.2d 169, 180; Kramer v. Johnson, 361 Mo. 1085, 238 S.W.2d 416; 30 C.J.S., Equity, § 608, p. 1005. While a prayer for general relief is sufficient to authorize the placing of the defendant in status quo, Gibson v. Shull, 251 Mo. 480, 158 S.W. 322, there was no prayer for general relief in the petition in the instant case, nor did the answer contain other than a general denial. The general rule that the decree in an equity action must conform to the pleadings applies, and defendant's contention must be disallowed.
Defendant contends that in any event plaintiff's recovery is limited to the cost of the shovel attachment ($1,227) and that plaintiff cannot recover the amounts paid on the whole consideration for all of the equipment. (The total purchase price was $16,910.94.) The crane consisted of an engine and cab mounted on rubber tires, together with several attachments each of which was adapted to a different type of work, e. g. trench hoe, dragline, clamshell, shovel, etc. Each attachment was priced separately but there was only one contract for the total amount of the crane and attachments. Since the evidence does not demonstrate breach of warranty as to the trench hoe, dragline and clamshell attachments, defendant contends that plaintiff could not rescind as to them. This contention is overruled. The crane and all of its component parts for its different operations were purchased at one time and delivered in one shipment. The contract arose out of one transaction. The attachments were not separately purchased. It was an entire contract, and not severable or apportionable. It was not one to be performed in installments. The attachment most useful and needed for plaintiff's purposes was the shovel attachment. As to the crane in use as a shovel a breach of warranty was fully disclosed. The shovel attachment was useless without the boom and crane engine and controls. Under the circumstances of this case there could not have been a partial rescission. Syme-Eagle & Co. v. Joplin Grocer Co., 206 Mo.App. 357, 229 S.W. 246; Herrington v. Julius Seidel Lumber Co., 209 Mo.App. 73, 236 S. W. 898. And see Palmer v. Reeves & Co., 139 Mo.App. 473, 122 S.W. 1119, in which it was held that a contract for the sale of a clover huller, feeder and stacker is not divisible but entire.
Finally, defendant claims that the failure of the trial court to make requested findings of fact and conclusions of law as required by Section 510.310 RSMo 1949, V.A.M.S. constitutes reversible error. The requirement of the statute in this regard is mandatory, and it is the duty of the trial court in a civil case tried upon the facts without a jury, upon request, to make a written statement of the grounds for its decision, and to include its findings on any of the principal controverted fact issues. While findings of fact are not conclusive on the appellate court, which must review the case upon both the law and the evidence as in suits of an equitable nature, Section 510.310, supra, they are of assistance and aid to the appellate court in reviewing the decision below, particularly in cases where the evidence is conflicting and close. Pudiwitr v. Soloman, *661 Mo.App., 224 S.W.2d 562. In the case at bar the record adequately discloses the issues of fact that were before the court, the trial court's failure to comply with the request of counsel does not impose an unnecessary burden on this court, and there is no particular need of findings of fact in order to decide the fact issues. Under such circumstances the error committed by the court is not substantial or prejudicial, and, in conformity with the statutory mandate not to set aside the judgment unless clearly erroneous, we do not find it necessary to reverse the judgment and remand the cause for failure to comply with Section 510.310, supra. See Hurwitz v. Hurwitz, 1943, 78 U.S.App.D.C. 66, 136 F.2d 796, 148 A.L.R. 226, for a similar construction of Federal Rule 52, 28 U.S.C.A.
Finding no error in the record, the Commissioner recommends that the judgment of the circuit court be affirmed.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the Court.
The judgment of the circuit court is, accordingly, affirmed.
BENNICK, C. J., and ANDERSON and RUDDY, JJ., concur.