Paul H. BURG, (Plaintiff) Respondent,

v.

BONNE TERRE FOUNDRY COMPANY, a corporation, (Defendant) Appellant.

No. 30925.

St. Louis Court of Appeals.

Missouri.

Feb. 20, 1962.

Rehearing Denied March 19, 1962.

Robert A. McIlrath, Flat River, for appellant.

Roberts & Roberts, Farmington, Robert H. Dierker, St. Louis, for respondent.

SAMUEL A. DEW, Special Commissioner.

Respondent sued in two counts to recover commissions due him for services rendered to appellant. In Count I he claimed under an oral contract of employment for commissions earned to September 19, 1958. In Count II he sued to recover commissions under a written contract of employment over a period ending December 31, 1959, the appellant having terminated the written contract as of January 1, 1960. Also, under Count II he sought to recover commissions on sales made between January 1, 1960, and May 18, 1960, to customers previously solicited by him. Further, under Count II respondent sued under the same contract to recover $2500, the alleged price (par value) for which appellant had agreed to repurchase from respondent 25 shares of its capital stock previously sold to the respondent by the appellant, which provision for repurchase appellant had failed and refused to perform.

A judgment for respondent was rendered in the total sum of $5,385.98, with a provision that $2500 thereof would be satisfied upon deposit by respondent of his certificate of said stock with the clerk, duly endorsed, and the payment therefor by the appellant of $2500. From such judgment the appellant has taken this appeal.

Under the pleadings and certain stipulations made at the trial, the only present controverted issues are whether it was the duty of the respondent to plead and prove the legality of appellant's promise to repurchase its stock; whether it was error to admit oral evidence as to what the appellant promised to pay to repurchase the stock; and whether the Court erred in allowing commissions on any sales made after the contract was canceled.

According to the evidence the respondent, then a salesman for appellant since May 15, 1958, under an oral agreement for employment, entered into a written contract with appellant dated September 19, 1958. The appellant company was engaged in the manufacture and sale of iron, alloy iron and steel castings. By virtue of the written contract respondent was appointed Sales Representative of the company in a certain described territory. The provisions of the written contract, so far as pertinent to the issues here involved, were that respondent should receive 10 percent commission on all net sales made on orders promoted through respondent in his territory, less freight, commissions payable on the 15th of the month following payment by the customer, respondent to pay all of his expenses incurred incident to his services; the contract to remain in force for one year, to be automatically renewed thereafter unless canceled by either party upon 60 days' notice given in writing at any time after one year; that if respondent requested the cancellation, the commissions were to stop automatically at such time and all commissions on sales made to date of cancellation to be paid; but that if appellant should cancel the contract, the commissions would continue to be paid respondent on sales made to his customers unless otherwise mutually agreed; that respondent, at appellant's request, had theretofore purchased and paid for 25 shares of stock at $100 per share (par value) and that "the aforementioned twenty-five shares of stock at one hundred dollars ($100.00) par value shall be purchased from the Sales Representative, if the contract is terminated."

By virtue of the answer and the stipulations referred to, it was admitted that $533.15 was due respondent under his Count I to which the Court added interest of $27.35, making a total sum of $560.70; that appellant owed respondent $647.61 on sales through December 31, 1959, to which the Court added interest of $33.70, total $681.31; and that the total sales after the termination of the contract to customers

previously solicited by respondent was $15,872, on which the Court allowed respondent 10 percent commission in the amount of $1587.20, to which the Court added interest of $56.57, a total of $1643.97, making an aggregate sum allowed respondent on account of commissions, $2885.98. To this the Court added $2500, as stated, as the agreed purchase price of the repurchase of the capital stock, making the total judgment $5,385.98.

Respondent testified that he entered into the performance of his duties under the written contract and that the amounts stipulated as due him for commissions were true and correct; that as stated in the contract he had purchased and received a certificate for 25 shares of the company's stock as agreed, for which he paid the appellant the par value of $2500. He identified and introduced a letter received by him from appellant dated November 10, 1959, which read:

"Dear Mr. Burg:

"This letter is to inform you that the Sales Representative Agreement which was signed by us Sept. 19, 1958 will not be in effect after January 1, 1960. At that time a new agreement will be discussed.

"Yours very truly,
"(S) Bonne Terre Foundry Co."

Respondent testified that the foregoing letter was the first notice he received of appellant's intention to cancel the existing written contract.

Respondent further testified that he received a second letter from appellant which was dated December 21, 1959. That letter referred to the previous letter, reiterated the statement that a new contract with respondent would be drawn up after January 1, 1960, as the existing contract would then be expired; that the commissions in the new contract would have to be cut to 5 percent and that the new contract would have to exclude any binders on stock transactions. The letter invited respondent to come in or write and state his intention. Respondent stated that no new contract was ever entered into with appellant and he denied that he had ever informed the appellant that he was canceling the contract or was agreeable to its cancellation.

Referring to the clause of the contract reading: "the aforementioned twenty-five (25) shares of stock at one hundred dollars ($100.00) par value shall be purchased from the Sales Representative, if this contract is terminated," respondent testified that the price to be paid on repurchase was to be $100 per share, the par value. He stated that he was ready and willing to deliver the stock upon payment of $2500 therefor, and had been ready and willing to do so since January 1, 1960. He said the stock had not been repurchased by appellant.

On cross-examination respondent said he considered the contract terminated as of January 1, 1960. He said the contract was prepared by him, with some outside assistance; that it was not signed at a directors' meeting, but in the office of the company; that it was not signed on the exact date shown; that he could not recall whether it was actually signed as late as December; that he was a member of the Board of Directors at that time, but resigned at the annual meeting in November, 1959; that he learned afterwards that 10 shares of stock were purchased at the time by appellant from Jack King, but that he had nothing to do with that transaction. He said that when he resigned from the Board of Directors in November, 1959, there had been rumors of a new contract at that time; that he told appellant he had not made up his mind about entering into any proposed new contract.

On the part of appellant its president testified that the existing contract was signed some time in December, 1958; that the personnel of the Board was changed in November at the annual meeting; that the secretary-treasurer and the witness were authorized to agree upon the matter of a contract with respondent; that the present

contract was later signed in the offices of the company in December. He said that since his letter terminating the contract he had frequently called respondent and asked him to come in and talk over the question of a new contract, but that respondent replied that he did not know the answer and "hung up."

Effort was made to show that respondent bought 10 shares of the stock from Jack King and 15 shares from appellant, but the evidence plainly shows that the respondent paid appellant $2500 and received from it a certificate for 25 shares. A stock certificate for 10 shares issued to Jack King and surrendered by him June 7, 1958, was introduced by appellant. Noted thereon are the words: "Surrender this certificate 6/7–1958 for Paul H. Burg (No. 16)." Appellant's brief and the transcript are incorrect in quoting the above notation to read "to" Paul H. Burg, instead of "for" Paul H. Burg. The certificate in evidence plainly uses the word "for."

In rebuttal respondent said he never owned any stock in the company other than the certificate for 25 shares described and shown in evidence.

Appellant's first point of error is that the judgment was contrary to law and public policy in that the respondent did not plead and prove that appellant under the laws and statutes could legally repurchase its own stock. As noted, the appellant in its answer pleaded generally that it was beyond its power and authority to repurchase its own stock, and that it would be violating the law by so doing, and that respondent had knowledge of that fact; but appellant did not plead or prove any facts on which those conclusions of law and fact were founded, nor did respondent plead or prove any facts relative to that charge.

The present statute, Section 351.390, 1959, V.A.M.S., was enacted in 1943, and specifically vested authority in corporations to purchase their own stock if such purchase will not impair their capital. It provides, in part, as follows: "A corporation shall have power to purchase, * * * its own shares; provided, that it shall not purchase * * * directly or indirectly, its own shares when its net assets are less than its stated capital, or when by so doing its net assets would be reduced below its stated capital. * * *"

However, appellant asserts that it was the burden of respondent, claiming under a provision of the contract for repurchase of its stock by the corporation, to plead and to prove that the agreement to repurchase the stock was not illegal, and maintains that without such pleading and proof the judgment is illegal and contrary to public policy. For this point appellant relies upon the principle recognized in certain cases cited, that where one seeks to recover on a statutory cause of action and the same statute and section thereof relied upon also prescribe the exceptions thereto, the petition and proof thereon must show that the claimant is not within such exceptions, but that if the statute creates a general liability, any exceptions thereto created in other sections or statutes must be pleaded and proved by the answer as matters of defense. Nichols v. Davidson Hotel Co., Mo.App., 333 S.W.2d 536, 546; Gardner v. Linwedel, Mo.App., 192 S.W.2d 613; Warren v. American Car & Foundry Co., 327 Mo. 755, 38 S.W.2d 718. Both parties, respectively, argue extensively as to the applicability of this rule of law to the case at hand.

Whatever may be said as to the effect of the above stated principle of law on the burden of pleading and proof in the instant case, relative to the illegality of appellant's agreement to repurchase its stock from respondent, and respondent's knowledge thereof, we believe the question here raised is determined by Section 509.090, 1959, V.A.M.S. (Session Acts 1943, p. 353, Sec. 40) and Supreme Court Rule 55.10, V.A.M.R. which statute and rule are identical. We believe they are binding on the Court and upon the parties. They provide that: "In pleading to a preceding pleading, a party shall set forth affirmatively * * * illegality * * * and any other matter constituting an avoi-

dance or affirmative defense. * * * " Accordingly, it was the statutory duty and burden of the appellant in its answer to respondent's petition to plead and to prove its charge of illegality in its promise to buy back its shares of stock sold by it to respondent. It did so plead in general terms in its answer and it was generally denied in respondent's reply, whereupon it became the burden of appellant to sustain its defense of illegality. Appellant, not having offered any proof to sustain its statutory burden, the respondent's failure to do so cannot invalidate the judgment in his favor.

■ Appellant next contends that it was error to permit oral evidence as to what price appellant agreed to pay for the repurchase of respondent's stock. It calls attention to the fact that respondent drew the contract and therefore it should be construed strictly against him; that the written contract does not state what amount was agreed upon for such repurchase, but merely states: "The aforementioned twenty-five (25) shares of stock at one hundred dollars ($100.00) par value shall be purchased from the Sales Representative, if this contract is terminated." Respondent's counsel took the position that in this respect the contract was ambiguous on the subject and that oral evidence was permissible to prove that the price agreed upon was the price paid by respondent, namely, the par value of $100 per share, $2500 for the total 25 shares. Appellant's counsel urged that the contract agreed on the number of the shares, their identification and par value, but not the price for such repurchase. If, as appellant contends, the price for such repurchase was intended to be left open, the respondent could demand a fabulous price or the appellant could have stood on a ridiculously low price, and thus the purchase clause would have served no purpose. Such construction would appear unreasonable. Furthermore, the respondent, while a witness, was asked if there was an agreement on the price for the repurchase and his answer that "it was understood $100 per share," was stricken out on motion as a conclusion of the witness, but later he testified without objection as follows: "Q. (By Mr. Roberts) Was there an agreement made between the two of you as to what they would pay back for the stock if it was repurchased—that's what I am asking you, Mr. Burg? A. There was. Q. And what were they to pay you for it, sir? A. $100.00 per share. Q. Now, has that ever been paid, Mr. Burg? A. It has not."

The trial court construed the language of the contract to mean that the par value of $2500 paid by respondent for the stock when he entered into the contract was to be the price for the repurchase. The Court in its Finding of Facts found that such was the ordinary meaning of the words of the agreement; that if any other amount had been in mind, surely the parties would have said so. We construe the contract likewise and conclude from its terms and surrounding circumstances in evidence that its intended purpose was to reimburse respondent fully for his stock investment in the company if his employment were terminated.

■ Lastly, the appellant makes the point that the Court erred in allowing respondent 10 percent commission on all the orders given by companies to the defendant after the contract was terminated, to-wit: January 1, 1960. For this item, as shown, the Court allowed $1643.97, inclusive of interest, for the period ending May 18, 1960. The two paragraphs of the contract on the subject are as follows:

"If the Sales Representative asks that this contract be cancelled the commissions will automatically stop when the contract is cancelled. Commissions to be paid in full for all sales made up to date of cancellation.

"If the Company cancels this contract the commissions will continue to be paid the Sales Representative for his customers unless some mutual agreement is reached between the Company and the Sales Representative."

It is contended by the appellant that the second paragraph above quoted is unilateral and perpetual if respondent refuses to make any other agreement. The respondent insists that the sales for the period there in question are meant to be only those sales on orders from such customers as had already been solicited by him as agent. The trial court so construed the wording. In fact, the amount allowed by the court on that classification of commissions was based on a total of sales stipulated by both parties as follows: "Also, it is further stipulated as to Count II that the amount of net sales made by defendant from January 1, 1959 [should be January 1, 1960] through May 18, 1960, on orders from customers previously called upon by plaintiff was $15,872.00; and it is further stipulated that the plaintiff did nothing during said period to procure said sales for defendant." Furthermore, upon the admitted termination of the contract, the authority of the respondent to solicit for the appellant would cease and he would no longer have any legal customers so far as the appellant's merchandise was concerned. As stated in Clarkson v. Standard Brass Mfg. Co., 237 Mo.App. 1018, 170 S.W.2d 407, 415, cited by the appellant, containing some similar facts as here relative to the termination of a salesman's authority: "A contract will not be construed to impose an obligation in perpetuity unless the unequivocal language of such contract compels such construction, and when executed for an indefinite period, and by its nature it is not deemed to be perpetual, it may be terminated at will upon reasonable notice," and "After the cancellation of the contract his (the agent's) employment ceased." See 17 C.J.S. Contracts § 398, p. 887; Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262.

As was said in Paisley v. Lucas, supra, as to the construction of a contract, at page 268: "For the purpose of determining the intention of the parties and reaching a construction that is fair and reasonable under all the facts and circumstances, the court may consider the relationship of the parties, the subject matter of the contract, the us-

ages of the business, the surrounding facts and circumstances attending the execution of the contract and its interpretation by the parties." In our opinion the charge of the appellant that the clause of the contract under consideration is invalid as unilateral and perpetual, is without merit.

Finding no error in the trial of this case materially affecting the merits, the judgment of the trial court should be affirmed. The Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DEW, Special Commissioner, is adopted as the opinion of the Court.

The judgment of the trial court is accordingly affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not sitting.